# Illinois Official Reports
## Supreme Court

***People v. Stoecker*, 2014 IL 115756**

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. RONALD L. STOECKER, Appellee. |
| Docket No. | 115756 |
| Filed | May 22, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Although a defendant convicted of rape and murder might possibly be excluded by a new type of DNA testing on previously tested material, his statutory motion for postconviction testing was properly denied where, by failing to plead and prove a greater potential to exclude him, he failed to make a *prima facie* case for a reasonable likelihood of more probative results, and where he failed to show a scientific potential to produce new, noncumulative evidence materially relevant to his claim of actual innocence. |
| Decision Under Review | Appeal from the Appellate Court for the Third District; heard in that court on appeal from the Circuit Court of Stark County, the Hon. Kevin R. Galley, Judge, presiding. |
| Judgment | Appellate court judgment reversed.<br>Circuit court judgment affirmed. |

| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and James D. Owens, State's Attorney, of Wyoming (Michael A. Scodro and Carolyn E. Shapiro, Solicitors General, and Michael M. Glick and Erin M. O'Connell, Assistant Attorneys General, of Chicago, of counsel), and Patrick Delfino, Terry A. Mertel and Gary F. Gnidovec, of the Office of the State's Attorneys Appellate Prosecutor, of Ottawa for the People. |
|---|---|
| | Michael J. Pelletier, Peter A. Carusona and Andrew J. Boyd, of the office of State Appellate Defender, of Ottawa, for appellee. |
| Justices | JUSTICE BURKE delivered the judgment of the court, with opinion. Chief Justice Garman and Justices Freeman, Thomas, Kilbride, Karmeier, and Theis concurred in the judgment and opinion. |

**OPINION**

¶ 1    In 1998, defendant Ronald L. Stoecker was convicted by a jury of first degree murder and aggravated criminal sexual assault and sentenced to concurrent terms of natural life and 30 years in prison. His convictions and sentences were affirmed on direct appeal. *People v. Stoecker*, No. 3-98-0750 (1999) (unpublished order under Supreme Court Rule 23). In 2009, defendant filed a *pro se* motion for postconviction deoxyribonucleic acid (DNA) testing pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2008)). Defendant requested that the circuit court order additional testing of forensic evidence using new DNA testing methods which were unavailable at the time of trial. The circuit court of Stark County denied the motion based on defendant's failure to meet the statutory requirements for postconviction DNA testing. The appellate court reversed and remanded for further proceedings. 2013 IL App (3d) 110300-U. For the following reasons, we reverse the judgment of the appellate court and affirm the judgment of the circuit court.

¶ 2                              BACKGROUND
¶ 3    On May 29, 1996, 15-year-old Jean Humble was living at a children's home in Peoria, Illinois. Humble left the home that evening to find a telephone. She accepted a ride from a man, who drove her to a remote rural area a few miles south of Wyoming, Illinois. The man sexually assaulted her, cut her throat, and left her in a field. Humble was able to walk to a nearby house, where the resident called 911. At the hospital, Humble described her assailant as a white, stocky man, approximately 20 to 30 years in age, with blond hair. She told police that he drove a red, four-door car. Humble died one month after her attack.

¶ 4   Defendant had previously resided with his family in a house located near the place where Humble was attacked. That house was vacant at the time of the crime. On the evening of May 29, 1996, defendant attended a class in Peoria for domestic abusers. Two people in the class observed defendant wearing a knife in his belt. Defendant was seen driving away in a red car at approximately 8 p.m.

¶ 5   At approximately 4:30 a.m. on May 30, 1996, the day after the crime, defendant purchased a plane ticket to Costa Rica using cash and left the country. Defendant previously had told his employer that "if he ever had any problems," he would go to Costa Rica because he believed the country had strict extradition laws. Wiretap recordings of conversations between defendant and his family indicated that defendant was attempting to elude the authorities.

¶ 6   In the early morning hours of May 30, 1996, a police officer observed defendant's two brothers tearing apart and burning the interior of a red car in front of the family's house. The brothers then brought the vehicle to a salvage yard. Approximately 18 months after leaving for Costa Rica, defendant was apprehended and extradited to Illinois, where he was charged with first degree murder and aggravated criminal sexual assault.

¶ 7   Patricia Marcouiller, a forensic scientist for the Illinois State Police in Morton, Illinois, examined a pair of pants from the victim and identified seminal material in the rear crotch area. That area of the cloth was blood-stained, diluted, and contained a "very small" amount of sperm. Marcouiller removed the piece of material containing the semen stain, packaged it separately, and forwarded it to the Joliet laboratory for DNA testing, along with a tissue standard from the victim and a blood standard from defendant.

¶ 8   Forensic scientist Aaron Small received the samples at the Illinois State Police laboratory in Joliet, Illinois. Small performed a differential extraction on the semen stain in order to separate the epithelial (*e.g.*, mouth, blood, anal or vaginal) cells from the sperm cells. The extraction resulted in two separate samples—a "male fraction" containing sperm cells and a "female fraction" containing epithelial cells. Small then performed a process called Polymerase Chain Reaction (PCR) on the male fraction, the female fraction, the victim's tissue standard, and defendant's blood standard. Small explained that PCR amplifies, *i.e.*, copies, the DNA present in the samples to allow scientists to indentify a DNA profile. He found that the male fraction contained a single male DNA profile, while the female fraction contained a DNA profile consistent with the victim, as well as a "light" DNA profile consistent with epithelial cells from another contributor.

¶ 9   Small next examined one locus, a specific location on an individual's chromosome, for each of the DNA profiles. He determined that the victim's DNA type at the locus termed "DQ alpha" matched the female fraction of the crime sample, and defendant's DNA type at DQ alpha matched the male fraction. Small then performed a PolyMarker test to examine five additional loci. At each of the five loci, defendant's profile matched the profile generated from the male fraction of the crime scene sample. Defendant and the victim also shared the same profiles at all five loci, which Small testified was not unusual because there are not many different types at those five loci. Finally, an additional locus on the first chromosome was examined, which indicated a match between defendant's DNA and the male fraction. Small concluded that defendant could be included as a possible contributor to the semen stain on the

victim's pants. He estimated that a DNA profile consistent with the profile matching defendant and the male fraction at the loci tested would be expected to occur in 1 in 41,000 Caucasians.

¶ 10 Rhonda Carter, a forensic scientist with the Illinois State Police in Chicago, performed additional PCR testing on the DNA evidence. Carter examined nine DNA markers and one sex typing marker for each of the samples and found that the DNA profile identified from the male fraction of the semen stain matched defendant's profile at all 10 markers. Based on this match, the semen in the male fraction was consistent with having originated from defendant. Carter testified that the DNA profile identified in the male fraction and in defendant's blood would be expected to occur in approximately 1 in 1.1 trillion Caucasians.

¶ 11 The jury convicted defendant of first degree murder and aggravated criminal sexual assault. Defendant was sentenced to concurrent terms of natural life in prison for murder and 30 years for aggravated criminal sexual assault.

¶ 12 On direct appeal, the appellate court affirmed defendant's convictions and sentences. *People v. Stoecker*, No. 3-98-0750 (1999) (unpublished order under Supreme Court Rule 23). Defendant proceeded to file multiple *pro se* motions and petitions for postconviction relief, all of which were dismissed by the circuit court. The appellate court affirmed the dismissal of defendant's fifth amended postconviction petition based on its untimely filing. *People v. Stoecker*, 384 Ill. App. 3d 289 (2008).

¶ 13 On February 25, 2009, defendant filed a *pro se* motion for postconviction forensic DNA testing pursuant to section 116-3 (725 ILCS 5/116-3 (West 2008)). The motion requested that the forensic evidence introduced at trial be subjected to two DNA testing methods which defendant alleged were unavailable at the time of his trial. These methods are known as mitochondrial (mtDNA) testing, and Y-chromosome (Y-STR) testing. Defendant further alleged: (1) that identity was the issue at trial which resulted in his convictions; (2) that numerous "irregularities and anomalies" in the previous DNA testing "call[ed] into question the integrity of the State's forensic results"; (3) that mtDNA and Y-STR DNA testing had the scientific potential to produce new, noncumulative evidence which was materially relevant to defendant's claim of actual innocence, even if it did not exonerate him; and (4) that mtDNA and Y-STR technologies were widely accepted and used by the relevant scientific community.

¶ 14 Defendant's appointed counsel filed a supplement to defendant's motion in which he alleged that mixed samples of male and female DNA, like the one in this case, "can lead to misidentification of the contributor(s) of the sample," and that Y-STR testing "allows resolution of a mixed sample from a male and female." Neither defendant nor his counsel asserted in the pleadings that the requested DNA testing methods provided a reasonable likelihood of more probative results than the previous methods to which the evidence was subjected.

¶ 15 In its motion to dismiss defendant's section 116-3 motion, the State argued that defendant failed to establish a difference between the mtDNA and Y-STR testing and the tests previously performed on the DNA evidence by the forensic experts who testified at trial. The circuit court denied defendant's motion for additional DNA testing. The court based its decision on the evidence presented at trial, the appellate court's finding on direct appeal that the evidence

against defendant was "overwhelming," and the lack of affidavits attesting to the scientific superiority of the testing methods requested by defendant.

¶ 16    On appeal to the appellate court, defendant argued that the circuit court erred in denying his request for Y-STR DNA testing because he satisfied the statutory requirements for postconviction DNA testing.[1] The appellate court, with one justice dissenting, reversed and remanded to the circuit court for further proceedings. 2013 IL App (3d) 110300-U. The court found that Y-STR testing had the potential to produce new, noncumulative evidence materially relevant to defendant's actual-innocence claim, based on Y-STR's potential to exclude defendant as a contributor to the semen stain on the victim's pants. *Id.* ¶ 27. The dissenting justice argued that defendant failed to indicate how Y-STR testing would produce a more probative result than the previous DNA testing, where both tests have the ability either to include or exclude an individual as a possible contributor of DNA. *Id.* ¶ 36 (Lytton, J., dissenting).

¶ 17    We allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2013).

¶ 18                                   ANALYSIS

¶ 19    At issue in this case is whether defendant has fulfilled two of the requirements for postconviction DNA testing under section 116-3 of the Code. That section provides, in relevant part:

"(a) A defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of fingerprint, Integrated Ballistic Identification System, or forensic DNA testing, including comparison analysis of genetic marker groupings of the evidence collected by criminal justice agencies pursuant to the alleged offense, to those of the defendant, *** on evidence that was secured in relation to the trial which resulted in his or her conviction, and:

(1) was not subject to the testing which is now requested at the time of trial; or

(2) although previously subjected to testing, can be subjected to additional testing utilizing a method that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results. Reasonable notice of the motion shall be served upon the State.

(b) The defendant must present a prima facie case that:

(1) identity was the issue in the trial which resulted in his or her conviction; and

(2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect.

(c) The trial court shall allow the testing under reasonable conditions designed to protect the State's interests in the integrity of the evidence and the testing process upon a determination that:

(1) the result of the testing has the scientific potential to produce new,

---

[1]Defendant did not appeal the circuit court's denial of his request for mtDNA testing.

noncumulative evidence materially relevant to the defendant's assertion of actual innocence even though the results may not completely exonerate the defendant;

(2) the testing requested employs a scientific method generally accepted within the relevant scientific community." 725 ILCS 5/116-3 (West 2008).

¶ 20    The State contends that defendant's section 116-3 motion is fatally deficient because he failed to plead, pursuant to subsection (a)(2), that Y-STR testing provides a reasonable likelihood of more probative results than the previous DNA tests conducted before trial. The State argues further that defendant failed to establish, pursuant to subsection (c)(1), that Y-STR testing has the scientific potential to produce new, noncumulative evidence materially relevant to his assertion of actual innocence.

¶ 21    Resolution of these issues requires an interpretation of section 116-3. Our primary objective is to ascertain and give effect to the intent of the legislature. *People v. Easley*, 2014 IL 115581, ¶ 16. The most reliable indicator of the legislative intent is the language in the statute, which must be given its plain and ordinary meaning. *Id.* Issues of statutory interpretation are subject to *de novo* review. *In re S.L.*, 2014 IL 115424, ¶ 16. A ruling on a motion for postconviction testing under section 116-3 also is reviewed *de novo*. *People v. Brooks*, 221 Ill. 2d 381, 393 (2006); *People v. Shum*, 207 Ill. 2d 47, 65 (2003).

¶ 22                                    I. Subsection 116-3(a)(2)

¶ 23    The appellate court below did not determine whether defendant showed that Y-STR testing provides a reasonable likelihood of more probative results. Defendant contends that there was no need for the court to undertake that analysis because there is no material distinction between the requirements articulated in subsection (a)(2) and subsection (c)(1). He argues that evidence that is genuinely "new," "noncumulative," and "materially relevant to the defendant's claim of actual innocence" must necessarily have been obtained utilizing a method "that provides a reasonable likelihood of more probative results." We disagree.

¶ 24    Subsection (a)(2) was added to the statute by the General Assembly in 2007. Pub. Act 95-688 (eff. Oct. 23, 2007) (amending 725 ILCS 5/116-3). Prior to the amendment, subsection (a) required a defendant to plead only that the evidence was not previously subjected to the forensic testing requested by the defendant because the technology was not available at the time of trial. See *People v. Brooks*, 221 Ill. 2d 381, 392-93 (2006) (citing 725 ILCS 5/116-3(a) (West 2002)). The statute did not distinguish between evidence which had undergone DNA testing before trial and evidence which had never been tested. The amended statute imposes a more stringent obligation on defendants seeking re-testing of evidence. Subsection (a)(2) provides that a motion seeking re-testing must show that the requested test (i) was not scientifically available at the time of trial; and (ii) provides a reasonable likelihood of more probative results than the previous testing. 725 ILCS 5/116-3(a)(2) (West 2008).

¶ 25    Defendant's proposed construction of subsection (a)(2) is contrary to the established principle of statutory interpretation that every clause of a statute must be given a reasonable meaning, if possible, and should not be rendered meaningless or superfluous. See *People v. Gutman*, 2011 IL 110338, ¶ 12. We do not believe that the General Assembly's purpose in amending the statute was to add a provision essentially identical to an existing provision.

Rather, in the absence of evidence to the contrary, we must presume that the legislature intended to change the existing law when it added subsection (a)(2). See *People v. Hicks*, 119 Ill. 2d 29, 34 (1987).

¶ 26 Under the plain language of the statute, defendants seeking additional testing of evidence which has already been subjected to testing have a greater burden to establish their case than those defendants whose evidence has not been tested. Pursuant to subsection (a)(2), a defendant must show that the additional testing is likely to produce more probative results than the previous tests. The analysis in subsection (a)(2) thus involves comparing the respective probative values of the two tests. Subsection (c)(1) requires a different analysis. After a defendant has established a *prima facie* case, the circuit court must assess the likelihood that the results of the testing sought by the defendant would materially advance a claim of actual innocence. *People v. Savory*, 197 Ill. 2d 203, 213 (2001). This assessment entails an evaluation of the evidence introduced at trial to determine whether the testing is likely to produce new, noncumulative evidence materially relevant to the defendant's claim of actual innocence. 725 ILCS 5/116-3(c)(1) (West 2008); *Savory*, 197 Ill. 2d at 213. Accordingly, defendant's argument that he need not comply with subsection (a)(2) because it is duplicative of subsection (c)(1) is incorrect.

¶ 27 After examining defendant's motion and supplementary motion, we find that defendant has failed to plead, pursuant to subsection (a)(2), that Y-STR testing has the potential to produce more probative results than the DNA testing methods to which the evidence was previously subjected. Defendant asserts that subsection (a)(2) has been established through his allegation that Y-STR allows resolution of a "mixed sample" of male and female DNA. He fails to allege, however, that Y-STR testing is better at separating male and female DNA in a mixed sample than the differential extraction process and DNA testing carried out before trial. Defendant's conclusory allegation concerning the value of Y-STR in resolving mixed samples, standing alone, is insufficient to obtain relief under section 116-3. See *People v. English*, 2013 IL App (4th) 120044, ¶¶ 16, 20 (denying the defendant's motion seeking fingerprint or forensic testing on the gun due to insufficiency of allegations in petition).

¶ 28 Similarly, the appellate court's finding that Y-STR testing has the possibility to exclude defendant as the contributor of the semen stain on the victim's pants does not establish that Y-STR testing will produce statistical results that are more probative than those presented at trial. As the State points out, any DNA test has the potential to exclude or include a subject as a possible contributor of DNA. Defendant does not allege, however, that Y-STR testing has a greater potential to exclude an individual as a contributor to a DNA sample than the DNA testing already conducted.

¶ 29 Moreover, defendant acknowledges in his brief that Y-STR testing expands, rather than narrows, the class of potential contributors to a crime scene sample. Y-STR testing examines particular regions on the male-specific Y chromosome which passes from father to son. *People v. Barker*, 403 Ill. App. 3d 515, 527-28 (2010) (citing Jules Epstein, *"Genetic Surveillance"—The Bogeyman Response to Familial DNA Investigations*, 2009 U. Ill. J. Tech. & Pol'y 141, 147-48). Thus, as defendant admits, all individuals in a paternal line will have the same Y-STR DNA profile. *Id.* A match between a suspect and evidence using the Y-STR

procedure means only that the suspect could have contributed the DNA in the forensic stain, as could his brother, father, son, uncle, paternal cousin, or a distant cousin from his paternal lineage. John M. Butler, Fundamentals of Forensic DNA Typing 366 (2010). As a result, autosomal DNA testing, *i.e.*, testing performed on chromosomes other than the sex chromosomes, is preferable to Y-STR testing since it is more effective and "provides a higher power of discrimination." *Id.* at 341, 366.

¶ 30    Defendant has not shown that Y-STR testing is likely to produce more probative results than the autosomal DNA testing performed by the forensic scientists who testified at trial. Although defendant argues that Y-STR testing is a powerful tool to demonstrate exclusions, or non-matches, between a suspect's DNA and crime scene DNA, he has not asserted that Y-STR's potential to exclude a suspect is greater than that of the previous tests. Defendant's section 116-3 motion for Y-STR DNA testing was properly denied by the circuit court on the grounds that defendant has failed to satisfy subsection (a)(2) of the statute. 725 ILCS 5/116-3(a)(2) (West 2008).

¶ 31                                    II. Subsection 116-3(c)(1)

¶ 32    Even if defendant's motion were sufficient to establish subsection (a)(2), the record does not show that Y-STR testing "has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence even though the results may not completely exonerate the defendant." 725 ILCS 5/116-3(c)(1) (West 2008). The circuit court thus properly denied defendant's motion for the additional reason that defendant failed to establish subsection (c)(1).

¶ 33    In *People v. Savory*, 197 Ill. 2d 203, 213 (2001), this court held that evidence which is "materially relevant" to a defendant's actual-innocence claim need not, standing alone, exonerate the defendant; rather, it must tend to "significantly advance" his claim of actual innocence. The determination of whether forensic evidence significantly advances the defendant's actual innocence claim requires an evaluation of the evidence introduced at trial, as well as the evidence the defendant seeks to test. *Id.* at 214.

¶ 34    In the case at bar, the evidence at trial, including the DNA test results which produced a match between defendant and the contributor of the semen on the victim's pants, together with the strong circumstantial evidence of defendant's guilt, confirms that the Y-STR testing requested by defendant is not likely to produce new, noncumulative evidence of defendant's innocence. The DNA tests performed on the semen stain established that defendant's DNA profile matched the profile of the male fraction at all of the markers tested by Small and Carter. Carter testified that the profile generated by her test results would be expected to occur in 1 in approximately 1.1 trillion Caucasians. Thus, there is no likelihood that additional testing using the Y-STR testing method would exonerate defendant given the decisive DNA test results introduced into evidence.

¶ 35    We agree with the dissenting justice in the appellate court, who concluded that defendant failed to show that Y-STR testing would produce "new, noncumulative evidence." "Without having indicated some inaccuracy in the original testing, the results of the Y-STR testing

should be the same as the results of the PCR testing; those results indicated that defendant could be included as a possible contributor to the semen stain found on the victim's pants." 2013 IL App (3d) 110300-U, ¶ 37 (Lytton, J., dissenting). In addition, the appellate court in defendant's direct appeal found the evidence against defendant "overwhelming." *People v. Stoecker*, No. 3-98-0750 (1999) (unpublished order under Supreme Court Rule 23). The court noted the conclusive DNA evidence, as well as the evidence of the knife observed in defendant's belt, the destruction of the red car by defendant's family members, and defendant's flight to Costa Rica.

¶ 36 Defendant concedes the significance of the DNA evidence in establishing his guilt but suggests that we should not consider this evidence in evaluating whether Y-STR testing has the potential to produce results materially relevant to his actual innocence. Defendant now asserts, for the first time, that there were "significant problems" with the DNA evidence offered at trial. He claims that: (1) the differential extraction process could have failed to completely separate the male and female fractions of the crime scene sample, resulting in the introduction of male DNA from sperm cells into the female fraction; (2) the DNA in the crime scene sample could have been contaminated with defendant's DNA after being amplified through the PCR process; (3) the forensic scientists failed to obtain a "complete" profile of the 13 core loci included in the FBI's Combined DNA Index System (CODIS); and (4) the PolyMarker and DQ alpha tests used by Small are not used by the FBI to complete its national DNA database based on the tests' low powers of discrimination.

¶ 37 Defendant's claims challenging the accuracy and value of the DNA testimony were not raised at trial nor were they raised on direct appeal. In addition, his allegations are not factually supported by the record, and, in some instances, are directly contrary to the evidence presented at trial. For example, there is no evidence to support defendant's claim that male DNA from sperm cells was introduced into the female fraction. Small, who was accepted by defendant at trial as an expert witness, testified that the differential extraction completely isolated the sperm cells from the epithelial cells. This process resulted in a male fraction containing a single male DNA profile, to which defendant's DNA profile was matched, and a female fraction containing the victim's DNA profile as well as a light DNA profile from another contributor. Small testified that he would expect to find DNA from another contributor's epithelial cells in the female fraction because any epithelial cells in the original sample would be developed in the female fraction. There was no testimony that the female fraction contained DNA from sperm cells, as alleged by defendant. Similarly, there is nothing in the record to support defendant's contention that the PCR process resulted in contamination of the male fraction with defendant's DNA from his blood standard. When Small was questioned as to whether PCR was susceptible to contamination, he answered that PCR is not susceptible to contamination when, as here, the samples are handled properly and proper precautions are taken. Furthermore, no evidence was adduced at trial regarding CODIS, the 13 core loci, or the FBI's standards for inclusion in its national DNA database. Defendant argues that the scientists' failure to obtain a "complete" 13-loci profile casts doubt on their testimony because it is possible that defendant could have been excluded from the crime scene sample through a non-match at one of the untested loci. Defendant's argument is unpersuasive, given Carter's

probative testimony that the 10-loci DNA profile matching defendant and the male fraction would be expected to occur only in 1 out of 1.1 trillion Caucasians.

¶ 38 Defendant further argues that, in his opinion, it was highly unusual for him to share the same profile as the victim at the five loci identified by the PolyMarker test, and Small's testimony to the contrary makes his expert opinion implausible. Defendant then suggests that the remainder of Small's testimony should be viewed with suspicion or rejected outright. Defendant does not cite to any authority, however, to explain why this court should reject Small's testimony that it was not unusual for the DNA profiles of the defendant and the victim to match at these five loci. Accordingly, we reject this argument.

¶ 39 We find it improper, at this stage, for defendant to attempt to impeach the DNA evidence presented at his trial. Defendant never raised these claims in the circuit court and offered no alternative DNA evidence or expert opinion at trial in opposition to the testimony of the State's witnesses. The record shows that defendant never challenged the admission of the DNA test results because they were inaccurate or improperly performed. Consequently, we find nothing to support defendant's claims that Y-STR testing has the scientific potential to produce new, noncumulative evidence relevant to his actual-innocence claim.

¶ 40 Considering the strength of the matches between the crime scene sample and defendant's DNA profile, in conjunction with the compelling circumstantial evidence of defendant's guilt, we conclude that Y-STR testing lacks the potential to produce new, noncumulative evidence in support of defendant's assertion of actual innocence. 725 ILCS 5/116-3(c)(1) (West 2008). The circuit court properly denied defendant's section 116-3 motion for additional DNA testing.

¶ 41                                        CONCLUSION

¶ 42 For the foregoing reasons, we reverse the judgment of the appellate court and affirm the judgment of the circuit court.

¶ 43          Appellate court judgment reversed.

¶ 44          Circuit court judgment affirmed.