2021 IL App (1st) 180921-U
No. 1-18-0921
Order filed January 19, 2021

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 97 CR 25090 |
| | ) | |
| AMOS CHAIRS, | ) | Honorable Thomas J. Hennelly, |
| | ) | Judge presiding. |
| Defendant-Appellant. | ) | |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Circuit court's denial of defendant's *pro se* motion for postconviction DNA testing affirmed where he failed to show that such testing had the potential to produce new evidence materially relevant to his claim of actual innocence.

¶ 2    Defendant Amos Chairs appeals from an order of the circuit court of Cook County denying his *pro se* motion for DNA testing pursuant to section 116-3 of the Code of Criminal Procedure (Code) (725 ILCS 5/116-3 (West 2018)). Defendant requested DNA testing of a pair of shoelaces tied together believed to be the murder weapon used to strangle the two victims. On appeal, defendant contends the court erred in denying his motion because the testing could have the

scientific potential to produce new, noncumulative evidence materially relevant to his claim of actual innocence by definitively revealing the murderer's identity. We affirm.

¶ 3     Defendant and codefendant Traye Booker were jointly indicted on multiple counts of first-degree murder, robbery, and unlawful restraint for the August 1997 robbery and strangulation deaths of Kevin Martin and Julio Meza. Following simultaneous but separate jury trials in March 1999, defendant was convicted of two counts of first-degree murder (720 ILCS 5/9-1(a)(3) (West 1996)) and one count of robbery (720 ILCS 5/18-1(a) (West 1996)). Booker was acquitted. Another codefendant, Tommy Clark, was separately charged, tried by a jury in July and August 1999, and convicted of the two murders and robbery.

¶ 4     The facts of defendant's trial were initially presented in this court's prior order affirming his convictions on direct appeal. *People v. Chairs*, No. 1-00-0094 (2001) (unpublished order under Supreme Court Rule 23). We discuss the evidence presented at trial as necessary for consideration of the issue in this appeal.

¶ 5     At trial, Chicago police detective Edward Winstead testified that about 11 a.m. on August 22, 1997, he investigated a double homicide in a tavern, John's Place, in the 7000 block of South Western Avenue. In the rear of the tavern was a washroom, a kitchen, and a bedroom. Inside the bedroom where the bodies of Martin and Meza. Martin was lying face-down on the bed with a gag in his mouth. He was "hog-tied" with his hands bound behind his back and tied to his feet with a blue electrical cord. There was a deep ligature mark on Martin's neck. Meza was lying face-down at the foot of the bed with a gag in his mouth that was tied around his neck. His hands were bound behind his back with an electrical cord and his feet were bound with a piece of cloth. Meza's pockets were turned inside-out. There were no ligatures around either man's neck. About a month

after the murders, Meza's vehicle was found two blocks from the tavern. The vehicle had been stripped. Police recovered a pair of shoelaces tied together from the floor of the vehicle. In court, the prosecutor handed Winstead the shoelaces and asked him to hold them up for everyone to see. Winstead identified the laces as those recovered from Meza's vehicle.

¶ 6     Deputy medical examiner Scott Denton testified that he performed autopsies on Martin and Meza. The men had nearly identical thin red horizontal ligature marks encircling their necks. The marks were about one-tenth of an inch and abraded or "rubbing" ligature marks. Denton opined that both men died from ligature strangulation, *i.e.*, strangulation from a cord or rope held around their necks. The pair of tied-together shoelaces was consistent with the strangulation marks on both men.

¶ 7     Tanya Robinson, a barmaid at the tavern, testified that when she arrived at the tavern about 9:30 p.m. on August 21, 1997, the door was locked. She looked through a window and saw Martin walking towards the back of the tavern. She knocked on the door and he let her in. Defendant, Booker, and Clark were sitting at the end of the bar. Robinson knew all three men. No one else was there. The three men rose from their bar stools and walked towards the bedroom in the back of the bar. Martin put money in the jukebox and turned up the volume. He then walked to the bedroom. Robinson sat at the bar alone, drinking a beer and listening to the music.

¶ 8     Shortly thereafter, Robinson used the washroom, which was directly across from the bedroom. When she exited the washroom, Robinson heard defendant repeatedly ask in a very angry voice, "where's the stuff at, where's the shit at?" An unfamiliar voice with a Hispanic accent responded, "I don't know where the rest of the shit is, please don't do this, please don't do this."

A third voice stated, "he knows where the shit is, he knows." Martin stated, "tell them what they want to know, tell them what they want to know."

¶ 9    Robinson walked quietly to the front of the tavern, sat at the end of the bar, and listened to the last song on the jukebox. She heard the back door close. Booker emerged from the rear of the tavern and approached Robinson. He put his hands on her shoulder and placed a ring in her hand. Booker looked her straight in the eye and told her that if the ring got to the police, "they'll know" she told, and if she told anyone "what they ha[d] done" he would kill her. Booker ran out the back door.

¶ 10    Robinson realized the bar had become very quiet. She repeatedly called Martin's name with no reply. Robinson walked to the back of the tavern, pushed the bedroom door open, and observed Martin lying on the bed, tied up with a cord around his neck. A second man whom she did not know was lying on the floor. He was also tied up and had an electrical cord around his neck. Robinson fled through the front door and ran home.

¶ 11    The next day, the police interviewed Robinson, but she did not tell them what she heard or saw because she was afraid Booker would kill her. Instead, she told police she last saw Martin the night before the murders, they had sex, and she stole his ring. On August 29, the police interviewed Robinson and she again lied to them. Later that night, she told the police what happened. On September 1, Robinson identified defendant and Booker in a lineup, and identified Clark in a photo array. Robinson acknowledged that around the time of the murders, she used heroin and cocaine a few times a month, but denied using drugs on the day of the murders.

¶ 12    Stacy Lynn Jones testified that at the time of the murders, defendant was her boyfriend. She knew him by the name "Billy Clyde" and the nickname "Gov" because he was a governor in

the Gangster Disciples. Jones knew Clark, defendant's assistant governor in the Gangster Disciples, by his nickname "Fruit." In August 1997, defendant and Jones were supposed to buy the tavern from Martin. During the first week of August 1997, Jones overheard defendant tell Clark that Martin was going to introduce defendant to a "Mexican" who had 50 pounds of marijuana. Defendant stated he was going to purchase the marijuana and sell it to his gang members for $800 per pound.

¶ 13    In mid-August, Jones, defendant, and Clark drove to a tavern on 59th Street where Martin was supposed to introduce defendant to "the Mexican." Defendant entered the bar alone and returned to the car 10 minutes later. Martin was not there, but defendant met "the Mexican" who told defendant he had a kilo of cocaine upstairs. Defendant suggested to Clark that they go inside and take the cocaine, but ultimately decided against it and drove home.

¶ 14    About noon on August 21, Jones, defendant, and Clark were riding in a vehicle when defendant told Clark that they were getting ready to take the marijuana from Martin and "the Mexican." Defendant dropped off Jones at 74th Street and Parnell Avenue. About 6 p.m., defendant picked up Jones from the same address. Jones asked defendant what happened. Defendant replied, "mother f*** wouldn't give it up." Defendant stated that he "and the folks took care of it." Defendant told Jones to stay out of it and to get rid of her cell phone because he had called Martin from her phone. Defendant also stated that he had to get rid of one of his pagers because Martin knew that number.

¶ 15    On August 23, defendant and Jones drove to 79th Street and Vincennes Avenue where defendant exited the vehicle and spoke with one of his "folks." The man asked defendant if he committed the murders on 71st and Western where two men were found duct-taped in a garbage

can. Defendant replied that he had nothing to do with those murders. When defendant returned to the vehicle, Jones asked him if he committed the murders. He said he had nothing to do with it. Jones warned defendant that fingerprints could be recovered from duct tape. Defendant told Jones "they didn't use no duct tape and they wasn't in no garbage can." Defendant also told Jones that if anyone asked her if he had gone to see Martin that day, she should say defendant was with her. Jones told defendant he was not with her at that time. He replied, "just tell them you was with me and everything will be cool. Just say you was with me. I was with you."

¶ 16    About 2:45 a.m. on September 1, police came to the motel room where defendant and Jones were staying and arrested defendant. Jones voluntarily went with police to the police station and gave a statement consistent with her trial testimony.

¶ 17    Assistant State's Attorney (ASA) Patrick Kelly testified that about 11:30 p.m. on September 1, he met with defendant, Detective James Cassidy, and ASA Tom Bilyk at the police station. Kelly advised defendant of his *Miranda* rights and questioned him about the murders. Defendant initially stated that he was with Jones all day on August 21. When asked if he was near the tavern and if he knew Martin and Meza, defendant admitted he had talked with Martin on the sidewalk outside the bar that afternoon. He claimed he did not enter the tavern that day. Defendant further admitted he knew Meza and said Martin and Meza had been trying to "set up a deal" to sell the tavern to defendant. Kelly pointed out to defendant that he had stated he was at the tavern on the day of the murders and he knew Martin and Meza. Defendant replied, "you know what, I was with Stacy Jones all that day and evening, that's it."

¶ 18    Kelly left the interview room but returned 30 minutes later when Cassidy notified him that defendant wanted to speak with him again. Kelly again advised defendant of his *Miranda* rights,

then confronted him with statements made by Jones. Defendant stated that he was sitting at the bar inside the tavern on the night of August 21, drinking a beer and talking with Martin and Meza about buying the tavern. Three men whom defendant knew as "Fruity," "Big Robin," and "Ant," entered the tavern. Fruity told defendant they were there to rob Martin. Fruity ordered Martin and Meza into the back room of the tavern. As Fruity walked past defendant, he told defendant to leave the tavern. Defendant stated that he went outside and stood on the sidewalk in front of the tavern for about 30 minutes, at which time Fruity, Big Robin and Ant exited the tavern carrying "some kind of a bundle." Fruity told defendant, "we killed them." Kelly confronted defendant with other information he had. Defendant replied, "f*** this, I was with my girlfriend all day and night on the 21st and if she says anything different she's lying."

¶ 19    Zulina Mason Stewart testified about a prior offense committed by defendant on August 15, 1977. Defendant and Stewart went to the home of Luther Price. Price propositioned Stewart for sex. Stewart told defendant about the proposition, and they devised a plan to rob Price by physically restraining him. Defendant and Stewart left Price's house. Stewart returned to the house alone and Price let her in. Stewart deceived Price into believing defendant had left and that she and Price could have sex for money. Stewart let defendant into Price's house. Defendant and Price immediately began arguing and went upstairs. Stewart heard the men fighting and struggling with each other in the bedroom. She went upstairs and observed defendant strangling Price with a cord. Defendant told Stewart to take Price's money. She reached into Price's pocket and did so. Defendant directed Stewart to put the money inside his pocket, and she did.

¶ 20    As defendant continued strangling Price, Stewart attempted unsuccessfully to tie Price's hands with a sweater. Defendant grabbed an electrical cord from the floor and tied Price's hands.

Defendant stuffed something inside Price's mouth and tied Price's mouth tightly with a towel. Stewart went downstairs and collected a few items she thought could be sold. She wiped fingerprints from any surfaces she and defendant had touched. Stewart returned upstairs and saw Price tied up with an electrical cord "going from the hands down and around the feet." Stewart and defendant left the house and drove away in Price's vehicle. She later learned Price had died. Stewart was convicted of Price's murder and robbery.

¶ 21    During deliberations, all the exhibits, including the shoelaces, were sent to the jury. The State provided the jury with latex gloves in case the jurors wanted to handle "the cords." The jury found defendant guilty of two counts of first-degree murder and robbery. The trial court sentenced defendant to consecutive life sentences for the murders and a concurrent sentence of seven years' imprisonment for robbery.

¶ 22    The record shows that the State used the shoelaces as an exhibit in Clark's subsequent jury trial. Thereafter, the shoelaces were impounded with all the other trial exhibits by the clerk of the circuit court.

¶ 23    On direct appeal, defendant argued that the State failed to prove him guilty beyond a reasonable doubt, and that the trial court erred by admitting evidence of his other crime, evidence of his gang membership, and statements he made to Kelly. This court rejected those arguments and affirmed defendant's convictions. *People v. Chairs*, No. 1-00-0094 (2001) (unpublished order under Supreme Court Rule 23).

¶ 24    In August 2002, defendant filed a *pro se* petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2002)) which the circuit court summarily dismissed. On appeal, this court allowed the State's confession of error and modified defendant's life

sentences to run concurrent rather than consecutive. *People v. Chairs*, No. 1-02-3094 (2003) (dispositional order).

¶ 25 On January 22, 2018, defendant filed the instant *pro se* motion for postconviction DNA testing pursuant to section 116-3 of the Code. Defendant stated that "[s]amples" from which DNA could be obtained were collected, and that "none of the material collected was subjected to the test requested." The remainder of defendant's motion alleged, *in toto*, as follows:

> "There was a shoe string that was told to the jury it was the murder weapon. It was never tested and it was put up against a blowen up picture of the victum [*sic*] neck where the abrasion was told to the jury that it fit. Thats why this shoe string need to be tested, along with everything else!
>
> Identity was the issue at the trial which resulted in this conviction.
>
> The DNA technology available today was not available at the time of the trial.
>
> To the best of my belief, the material collected is in the possession of the proper authorities and has not been tampered with replaced, or altered in any material aspect.
>
> Test results are relevant to an assertion of actual innocence.
>
> Requested testing uses generally accepted scientific methods."

Defendant requested the circuit court appoint him counsel and order the DNA testing.

¶ 26 On February 23, 2018, the circuit court denied defendant's motion *sua sponte*. The court stated, *in toto*, "He's asking to have DNA testing done. It's a '99 conviction. Motion for DNA testing is considered and denied."

¶ 27 On appeal, defendant contends the circuit court erred in denying his motion for DNA testing because testing the shoelaces could have the scientific potential to produce new,

noncumulative evidence materially relevant to his claim of actual innocence by definitively revealing the murderer's identity. Defendant asserts that the killer's DNA is likely on the laces, and would have to match either him, Booker, or Clark. Defendant claims that if another person's DNA is on the laces, the State's theory of the case and Robinson's testimony falls apart. Defendant points out that no forensic evidence connected him to the murders or crime scene, and argues that it is "far from inconceivable" that testing the laces could result in advancing his claim of innocence.

¶ 28    The State responds that defendant failed to show that the laces were subject to a sufficient chain of custody to establish that they had not been substituted or altered in any material aspect where they were sent to the jury during deliberations and there is no indication whether the jurors wore the latex gloves while handling the laces. The State further argues that testing would not advance a claim of innocence where defendant was convicted under a theory of accountability. The State asserts that whether defendant touched the laces or strangled the victims would not be exculpatory, and therefore, is not relevant.

¶ 29    Section 116-3 of the Code provides, in relevant part, that a defendant may make a motion in the circuit court for forensic DNA testing "on evidence that was secured in relation to the trial" that resulted in his conviction, and at the time of trial, that evidence was not subject to the requested testing. 725 ILCS 5/116-3(a)(1) (West 2018). Defendant's motion must present a *prima facie* case that: (1) identity was the issue in the trial that resulted in his conviction, and "(2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect." 725 ILCS 5/116-3(b) (West 2018).

¶ 30    After defendant has established a *prima facie* case, the trial court shall allow the requested testing if it determines that: "(1) the result of the testing has the scientific potential to produce new, noncumulative evidence" that is "materially relevant to the defendant's assertion of actual innocence *** even though the results may not completely exonerate the defendant"; and (2) the requested testing "employs a scientific method generally accepted within the relevant scientific community." 725 ILCS 5/116-3(c) (West 2018). Evidence is "materially relevant" to a claim of actual innocence if it tends to significantly advance such a claim even if it does not, standing alone, exonerate the defendant. *People v. Stoecker*, 2014 IL 115756, ¶ 33. To determine whether DNA evidence would significantly advance an actual innocence claim, the court must evaluate the evidence presented at trial as well as the evidence defendant wants tested. *Id.*

¶ 31    The circuit court may deny a section 116-3 motion *sua sponte* when the defendant clearly is not entitled to relief as a matter of law. *People v. O'Connell*, 227 Ill. 2d 31, 38 (2007). We review the circuit court's denial of a motion for forensic DNA testing *de novo*. *Stoecker*, 2014 IL 115756, ¶ 21. On review, this court may affirm the circuit court's judgment on any basis in the record. *People v. English*, 2013 IL App (4th) 120044, ¶ 14.

¶ 32    As a threshold matter, we find the State's challenge to the sufficiency of the chain of custody unpersuasive. Without citing any authority for its proposition, the State argues defendant failed to establish a chain of custody because he has not established that the shoelaces were not substituted, tampered with, replaced, or altered in any material aspect while in the jury room during deliberations. Defendant cannot be expected to present such proof where neither he, nor anyone else, would have knowledge of what occurred during the jury's deliberations. The State asserts that the jurors may have touched the laces, which could have altered any DNA on them. That is

possible. The record shows that the prosecutor and Winstead also handled the laces during trial, and there is no indication either of them were wearing gloves. However, whether defendant's motion sufficiently established the chain of custody, and whether the shoelaces contain any DNA evidentiary value are two separate questions.

¶ 33    Here, the chain of custody has not been broken. The State presented the shoelaces as evidence at trial. Winstead testified that police recovered the laces from the floor of Meza's stripped vehicle, which was found two blocks from the tavern a month after the murders. All the exhibits, including the shoelaces, were sent to the jury during deliberations. The State provided the jury with latex gloves in case the jurors wanted to handle "the cords" while examining the evidence. The record shows that the State subsequently presented the shoelaces as an exhibit in Clark's trial four months after defendant's trial. Thereafter, the laces were impounded by the clerk of the circuit court pending further order of the court. The record thereby shows that the shoelaces have remained in the custody of the State and the circuit court clerk since trial.

¶ 34    Defendant alleged in his motion, "To the best of my belief, the material collected is in the possession of the proper authorities and has not been tampered with replaced, or altered in any material aspect." Although defendant's assertion is conclusory, this court has previously found that an allegation that the evidence to be tested has been in the possession of the police or a state authority is facially sufficient to satisfy the chain of custody requirement of section 116-3 because a defendant cannot be expected to prove a proper chain of custody at the outset where the evidence has undoubtedly been in the custody of the State and the court. *People v. Kines*, 2015 IL App (2d) 140518, ¶ 29 (citing *People v. Johnson*, 205 Ill. 2d 381, 393 (2002)); *People v. Bailey*, 386 Ill.

App. 3d 68, 74-75 (2008) (and cases cited therein). Accordingly, defendant satisfied the chain of custody requirement of section 116-3(b)(2).

¶ 35    Nevertheless, we find that defendant's motion failed to demonstrate that DNA testing of the shoelaces could produce evidence that is materially relevant to his assertion of actual innocence as required by section 116-3(c)(1). Defendant's motion merely alleged "[t]est results are relevant to an assertion of actual innocence." Defendant's conclusory allegation makes no assertion as to what probative value the results of DNA testing of the shoelaces would reveal or how such evidence would be materially relevant to his claim of actual innocence.

¶ 36    Section 116-3 of the Code does not provide a defendant with a general means to discover evidence. *People v. Barrow*, 2011 IL App (3d) 100086, ¶ 30. Here, defendant's motion is nothing more than a generic request to test the shoelaces for DNA.

¶ 37    Whether or not the shoelaces contain the DNA of any of the three defendants, either victim, or an unidentified party would have no impact on the State's evidence that sustained defendant's conviction, which this court found sufficient on direct appeal. Robinson, who knew all three defendants, testified that defendant was one of the three men who was in the bedroom with Martin, and she heard defendant demanding to know "where's the stuff at." She heard a Hispanic man begging "please don't do this," and heard Martin say, "tell them what they want to know." Booker emerged from the bedroom, gave Robinson Martin's ring, and told her he would kill her if she told anyone "what they ha[d] done." Robinson then observed the lifeless bodies of Martin and Meza, gagged and tied up with electrical cords in the bedroom. Jones testified to defendant's motive, his tacit admission of wrongdoing after the murders, and his attempt to establish a false alibi. Kelly testified to defendant's inconsistent accounts of his whereabouts on the night of the murders, and

his admission that he was at the tavern when the murders occurred. Stewart testified to defendant's earlier murder of Price, establishing defendant's *modus operandi*. As the State points out, defendant was convicted on a theory of accountability. In light of the strong evidence presented against defendant at trial, a lack of his DNA on the shoelaces would not significantly advance his claim of actual innocence. *Stoecker*, 2014 IL 115756, ¶ 33; *English*, 2013 IL App (4th) 120044, ¶ 23.

¶ 38     Similarly, whether any DNA evidence found on the shoelaces matches or does not match the victims would have no impact on the jury's verdict that defendant was guilty of the murders on a theory of accountability. DNA testing results would not undermine the State's evidence, detailed above, that defendant was accountable for the murders of Martin and Meza. DNA evidence was not at issue in this case. Therefore, the DNA testing would be collateral to the evidence presented at trial, and thus, not materially relevant because it would not significantly advance a claim of innocence. *People v. Gecht*, 386 Ill. App. 3d 578, 582 (2008).

¶ 39     Moreover, the shoelaces were not recovered with the bodies at the murder scene, but instead, were found a month later when Meza's stripped vehicle was discovered two blocks from the tavern. The laces were handled at trial by the prosecutor and Winstead, and possibly by the jurors during deliberations. The laces were subsequently introduced into evidence at Clark's trial four months later. Consequently, the existence of another person's DNA on the shoelaces is quite possible and would not significantly advance defendant's claim of actual innocence. *Stoecker*, 2014 IL 115756, ¶ 33; *English*, 2013 IL App (4th) 120044, ¶ 24.

¶ 40     We conclude that DNA testing of the shoelaces would not be materially relevant to defendant's claim of actual innocence. Accordingly, defendant's motion for section 116-3 testing

is insufficient as a matter of law, and the circuit court's *sua sponte* denial of the motion was proper. *O'Connell*, 227 Ill. 2d at 31.

¶ 41    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 42    Affirmed.