**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 210607-U

Order filed July 12, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-21-0607 Circuit No. 06-CF-1265 |
| CAMERON ALLEN PURYEAR, | ) ) ) | Honorable Katherine S. Gorman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ALBRECHT delivered the judgment of the court.
Justices Brennan and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   The circuit court did not err in denying defendant's motion for DNA testing.

¶ 2     Defendant, Cameron Allen Puryear, appeals the Peoria County circuit court's denial of his motion for DNA testing. Defendant argues that the evidence sought to be tested had the potential to produce new, noncumulative evidence that is materially relevant to defendant's claim of actual innocence. We affirm.

¶ 3                                      I. BACKGROUND

¶ 4    The State charged defendant with two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2006)) for the death of John Buckley. The matter proceeded to a jury trial. Allen Buckley, John's brother, testified that he lived with John and owned a white car that they both used. Officers were investigating a shooting in the neighborhood and questioned John and Allen. While speaking with the officers, Allen observed gang members watching him and John. Approximately one week later, September 20, 2006, at approximately 11 p.m., John drove the white car home. Shortly after 11 p.m., Allen heard two gunshots close to his apartment. He observed John stumble through the door and collapse. John died later that night from a gunshot wound to the chest. John's girlfriend, Chelsea Tyler, testified that she was on the phone with John when she heard other voices with John on the line. Tyler heard one voice say, "[w]e heard motherfuckers snitching."

¶ 5    Nicole Mitchell testified that on September 20, 2006, she hosted a party at her house with defendant, Milan Gibson, Tavar Carpenter, Cash Ballew, and several others in attendance. At the party, defendant posed for photographs holding an automatic "military gun." Shortly after 11 p.m., party attendants dispersed, and Nicole observed defendant "passed out" on her porch. At some point, Nicole saw a white car drive past her home and heard someone say, "[h]ey, there go that white car again." Soon after, defendant left the porch and walked toward Linn and Richmond, an intersection that was one house north of Nicole's home. A short time later, defendant, Erica Mitchell, Ballew and others entered quickly through Nicole's front door. Defendant looked "scared" and everyone was "shooken up" and "crying." Defendant asked Nicole if he could use her bathroom to wash his hands. Defendant spent the night at Nicole's house and left early the next morning.

2

¶ 6    Erica testified that she lived with her sister, Nicole, and was at home at the time of the murder. Around 11:30 p.m., Erica was standing with defendant, Gibson, and Carpenter outside of the house near the intersection of Linn and Richmond. Erica observed a white car drive by, and defendant and Gibson walked in the direction of the car. Erica heard an argument and then two gunshots from the area of the car, approximately four houses away. Erica ran back into the house and defendant entered behind her. Defendant had a "weapon" in his hand and said, "I shot somebody." Defendant asked for bleach and proceeded to wash his hands with the bleach. Erica observed Ballew holding the black hooded sweatshirt that defendant had worn earlier in the day. Ballew asked for ammonia and threw the sweatshirt into the basement. The following night, defendant told Erica that he had shot John because John "tried to take his gun," and "[n]ot to speak about anything that happened the night before." Later, defendant told Erica that he "gets rid of snitches."

¶ 7    On cross-examination, Erica stated that defendant wore the black hooded sweatshirt on and off throughout the day and into the night. Defendant was wearing the sweatshirt just prior to Erica hearing gunshots. After the shooting, defendant told Ballew to put the sweatshirt in the washer with bleach.

¶ 8    Peoria detective Katie Baer, responded to a separate incident at Nicole and Erica's residence on September 23, 2006. Following a conversation with Erica, Baer learned information related to the September 20 murder. After, Baer located a black hooded sweatshirt in a pile of clothes near the washer and dryer in the basement. Baer did not know if the clothes were clean or dirty but described a "musty smell."

¶ 9    Peoria police officer Scott Bowers testified that the black hooded sweatshirt located in the basement had "whitish" stains of an unknown origin on the front. Bowers did not believe that the

3

sweatshirt had been washed due to the stain. No DNA or gunshot residue analysis was completed on the sweatshirt. Bowers explained that gunshot residue was not conducted due to officers locating the sweatshirt in a pile of clothing three days after the murder, as "there would be no way to know whether between that time the gunpowder residue got put on there, if some of the other items in the pile of clothing had gunshot residue, those could easily be transferred onto this sweatshirt." Bowers agreed that the "sweatshirt could have been put there a month before" it was located.

¶ 10    Kasey Vespa testified that defendant was her live-in boyfriend at the time of the murder. Vespa picked defendant and Gibson up from the intersection of Linn and Richmond the morning after the murder. After arriving at their apartment, Vespa observed defendant cleaning his firearm. Later that day, after dropping defendant and Gibson off at another house, Vespa removed defendant's belongings from the apartment, including defendant's firearm.

¶ 11    The jury found defendant guilty. The court sentenced defendant to 71 years' imprisonment. On direct appeal, defendant presented several claims of prosecutorial misconduct. *People v. Puryear*, No. 3-08-0092 (2009) (unpublished order under Illinois Supreme Court Rule 23). We affirmed, finding that any errors committed were not prejudicial in light of the overwhelming evidence of defendant's guilt. Defendant filed a postconviction petition alleging various claims of ineffective assistance of trial and appellate counsel. Following a second-stage proceeding, the court dismissed defendant's petition. Defendant did not appeal.

¶ 12    Defendant filed a motion for DNA testing, which is the subject of this appeal. The circuit court granted the State's motion to dismiss, which argued that DNA testing would fail to provide any material evidence to advance defendant's actual innocence claim due to the sweatshirt being handled by more people than just defendant, the strong inference from the trial evidence that

4

ammonia had been used on the sweatshirt, and the three-day delay in locating the sweatshirt. The court denied defendant's motion to reconsider. Defendant appeals.

¶ 13                                  II. ANALYSIS

¶ 14        Defendant argues that the circuit court erred in denying his motion for DNA testing because the black hooded sweatshirt had the potential to produce new, noncumulative evidence materially relevant to defendant's claim of actual innocence. Specifically, defendant contends that, under the State's theory, the sweatshirt should contain his DNA, and if his DNA is absent, it would be materially relevant to his claim that he was not involved in the murder. Additionally, if another person's DNA is recovered from the sweatshirt, it would bolster defendant's alibi defense. We disagree.

¶ 15        Section 116-3(a) of the Code of Criminal Procedure of 1963 states that following a trial resulting in defendant's conviction, a defendant may make a motion before the circuit court for forensic DNA testing on evidence secured in relation to the trial that:

> "(1) was not subject to the testing which is now requested at the time of trial; or
>
> (2) although previously subjected to testing, can be subjected to additional testing utilizing a method that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results." 725 ILCS 5/116-3(a)(1), (2) (West 2020).

Additionally, defendant must make a *prima facie* case that:

> "(1) identity was the issue in the trial *** which resulted in his or her conviction; and

"(2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect." *Id.* § 116-3(b)(1), (2).

¶ 16 When a defendant has established a *prima facie* case, the court must assess the likelihood that the test results would materially advance defendant's claim of actual innocence. *People v. Stoecker*, 2014 IL 115756, ¶ 26. This assessment requires evaluating the trial evidence to determine whether the testing is likely to produce "new, noncumulative evidence materially relevant to the defendant's claim of actual innocence." *Id.*; 725 ILCS 5/116-3(c)(1) (West 2020). Materially relevant evidence tends to significantly advance defendant's claim of actual innocence. *People v. Savory*, 197 Ill. 2d 203, 213 (2001). A determination of whether the evidence is materially relevant requires consideration of the evidence introduced at trial, as well as an assessment of the evidence defendant is seeking to test. *Id.* at 214. We review *de novo* the circuit court's denial of a motion for DNA testing. *Stoecker*, 2014 IL 115756, ¶ 21.

¶ 17 Initially, we note that the State concedes defendant made a *prima facie* showing that identity was an issue at trial. See *People v. Grant*, 2016 IL App (3d) 140211, ¶ 22. The State calls into question defendant's *prima facie* showing of the chain of custody component, relying on potential tampering prior to the sweatshirt entering police custody. We have consistently held that chain of custody refers to what occurred with the evidence following its retrieval by the State. See *People v. Perez*, 2016 IL App (3d) 130784, ¶¶ 29, 32. Therefore, we find that defendant has established a *prima facie* case that the sweatshirt was subject to a sufficient chain of custody.

¶ 18 Next, we will assess the likelihood that results from DNA testing would materially advance defendant's claim of actual innocence. See *Stoecker*, 2014 IL 115756, ¶ 26. In the present case, the absence of defendant's DNA on the sweatshirt does not have the potential to be materially

6

relevant to a claim of actual innocence given the tenuous connection between the sweatshirt and the murder. First, the testimony at trial indicated that more than one person was likely involved in the shooting, and there was no eyewitness or direct evidence that the shooter wore a black hooded sweatshirt. Therefore, a DNA match to either defendant or another individual would not tend to establish that the matched individual committed the murder. Stated another way, a lack of defendant's DNA would not be probative of defendant's innocence as it would not eliminate him as a participant in the shooting. Moreover, evidence of defendant's ownership of the sweatshirt was a minor part of the evidence at trial and not central to the State's evidence of defendant's guilt, considering defendant's admissions and actions following the shooting. See *supra* ¶¶ 6-7, 10; see also *Savory*, 197 Ill. 2d at 215; *People v. English*, 2013 IL App (4th) 120044, ¶¶ 21-24 (the link between the crime and fingerprints too attenuated for additional testing to significantly advance a claim of actual innocence).

¶ 19     Second, the trial testimony established that forensic analysis was not completed due to the three-day delay in recovering the sweatshirt in a pile of other clothing. The record is silent as to who was in the house in those three days. DNA evidence could have been left by many people innocent of the murder, including individuals who touched the sweatshirt before or after the murder. Therefore, even if testing identified another person's DNA or defendant's DNA was absent, it would not tend to support his claim of actual innocence because there is no evidence to show what happened to the sweatshirt in the three days before being recovered. See *Savory*, 197 Ill. 2d at 215; *English*, 2013 IL App (4th) 120044, ¶¶ 21-24. Accordingly, we find no error in the court's denial of defendant's motion for DNA testing.

¶ 20                                          III. CONCLUSION

¶ 21     The judgment of the circuit court of Peoria County is affirmed.

¶ 22        Affirmed.