2021 IL App (1st) 172998-U

No. 1-17-2998

Order filed January 22, 2021

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05 CR 12281 |
| | ) | |
| MARSHALL STEWART, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Mikva and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1     *Held*:  We affirm the trial court's denial of defendant's *pro se* postconviction motion for DNA testing because he failed to establish that further retesting of forensic evidence would provide a reasonable likelihood of more probative results or new, noncumulative evidence materially relevant to his claim of actual innocence.

¶ 2     Defendant Marshall Stewart appeals from the trial court's order denying his *pro se*

postconviction motion, filed pursuant to section 116-3 of the Code of Criminal Procedure of 1963

(Code) (725 ILCS 5/116-3 (West 2016)), seeking deoxyribonucleic acid (DNA) testing of the

sexual assault kit and semen found on the victim's clothes. On appeal, defendant contends the circuit court erroneously denied his motion where he presented a *prima facie* case for the DNA testing, and the newly available, more sophisticated testing had the potential to produce new evidence relevant to his claim of actual innocence. For the following reasons, we affirm.

¶ 3    Following a 2008 bench trial, defendant was found guilty of four counts of aggravated criminal sexual assault and one count of aggravated kidnaping, and sentenced to an aggregate term of 43 years' imprisonment. We affirmed defendant's convictions on direct appeal (*People v. Stewart*, No. 1-08-2630 (2010) (unpublished summary order under Supreme Court Rule 23(c)(2)). We recite only the facts necessary to resolve the issue raised on appeal.

¶ 4    At trial, N.M. testified that on July 26, 2004, she was walking on the 2000 block of North Racine Avenue in Chicago, when she felt a person come behind her and place his arms around her neck "in a choke hold." The man dragged her to the ground, unzipped her pants and placed his fingers inside her vagina. He then pushed her into a gangway, held a knife against her throat, pulled her pants down, and proceeded to have vaginal intercourse with her. The man also attempted to have anal intercourse with her, but "gave up on that" and had vaginal intercourse with her a second time. She never saw the man. N.M. contacted the police, who drove her to the hospital. At the hospital, the staff treated her injuries, and took a vaginal swab and a sample of pubic hair.

¶ 5    On cross-examination, N.M. acknowledged she never saw her attacker's face, any identifying features, and did not know the man.

¶ 6    Chicago police officer Michael Infelise testified that he was dispatched to the scene of the incident. He interviewed N.M. and escorted her to the hospital.

¶ 7 Memuna Eccles-James testified she was a registered nurse who was working the night shift on July 26, 2004. She treated N.M., who told her that "she was dragged into the alleyway, pinned down to the wall and somebody * * * pulled down her pants and attempted to rape her." Eccles-James observed scratch marks on N.M., in particular around her neck, and assisted Doctor Moretti, the emergency room physician, with the specimen collection. Eccles-James identified the specimen kit in court. After sealing the kit, Eccles-James handed it to Investigator Kawasaki from the Chicago Police Department.

¶ 8 Roy Kawasaki testified he worked as an evidence technician with the forensic services division of the Chicago Police Department. He photographed and recovered evidence from the scene and took photographs of N.M. at the hospital. Kawasaki also collected the sexual assault kit from the hospital and identified it in court. After he collected the kit, Kawasaki inventoried it at his office and prepared it for shipment to the Illinois State Crime Lab.

¶ 9 Michael Conway testified he was a detective with the Chicago Police Department who investigated N.M.'s case. Conway interviewed defendant on May 12, 2005 at the police station. After reading defendant his *Miranda* rights, Conway questioned him about the incident that occurred on July 26, 2005. Defendant admitted to committing the assault and told Conway that "he had been frustrated at his life and home and he was drinking a lot" at the time. Defendant stated that he was driving that evening while impaired when he saw N.M. walking down the street. Defendant told Conway that N.M. "looked great" and was talking on her cellular phone when he saw her. Defendant stated he "just wanted immediate gratification" and got out of the car, followed her, and placed her "in a choke hold * * * to put her to sleep." Defendant then stated he dragged her into a gangway, put a serrated key to her throat, pulled down her pants, and sexually assaulted

her. After the interview, an evidence technician arrived and took a buccal swab from defendant. Defendant subsequently gave his handwritten statement to an assistant state's attorney.

¶ 10     Kelly Navarro testified that she was an assistant state's attorney in Cook County. Navarro took defendant's written statement on May 12, 2005 after reading him his *Miranda* rights. Navarro identified the statement and published it on the record. The events of the statement are consistent with Detective Conway's recitation of his interview with defendant. Defendant signed each page of the handwritten statement.

¶ 11     Manuel Sanchez testified he was the evidence collection technician for the state's attorney office, Sex Crimes Division, and collected a buccal swab from defendant. Sanchez identified the buccal swab he collected on the record. On cross-examination, Sanchez stated that after he sealed the sample, he gave it to Investigator Eileen Moran, who would either take it to the Illinois State Police or the Chicago Crime Lab.

¶ 12     Moran testified she was an investigator with the Cook County State's Attorney's Office. On September 14, 2004, she received defendant's buccal swab from Sanchez and transported it to the Chicago Police Department Crime Lab where she turned it over to Lori Lewis, who was in charge of that department. Moran identified the buccal sample she transported and stated it appeared in the same or substantially the same condition as when she received it.

¶ 13     Lewis testified she was a criminalist for the Chicago Police Department's forensic services section. On September 14, 2004, her lab received forensic evidence related to this case and held it in a secure location.

¶ 14     Michael Cariola testified that he was the vice president of forensic operations at the Bode Technology Group (Bode) and was a technical leader at the time of the incident. Bode had a

contract with the Illinois State Police to assist with their DNA backlog, and as a result, received evidence related to the present case. The evidence was tested at Bode and found the victim's profile was consistent with N.M.

¶ 15    On cross-examination, Cariola stated in 2005, the Illinois State Police cancelled the contract with Bode with respect to "the sperm search portion contract." The Illinois State Police performed an audit of Bode's serological work and found an error rate of approximately 22 percent of the sperm searches which they audited. No sperm search was performed in this case.

¶ 16    Brian Schoon testified he was a forensic scientist at the Illinois State Police Forensic Science Center. On April 20, 2005, Schoon received the buccal swab standard from defendant and prepared it for forensic DNA analysis. As a part of the analysis, Schoon performed a Polymerase Chain Reaction (PCR) test, which resulted in defendant's DNA profile. Schoon then compared the profile to the profile from N.M.'s vaginal swab, which was analyzed at Bode. After comparing the profiles, Schoon concluded that the male DNA profile identified from the vaginal swabs matched the DNA profile of defendant. He explained that "the profile would be expected to occur approximately one in 3.3 quintillion blacks, one in 620 quadrillion white or one in 150 quadrillion Hispanic unrelated individuals."

¶ 17    On cross-examination, Schoon stated that when he extrapolated data from the DNA sample, it looked like a "set of numbers at * * * 13 different spots" on the various chromosomes.

¶ 18    The court found defendant guilty of four counts of aggravated criminal sexual assault and one count of aggravated kidnaping, and sentenced him to an aggregate term of 43 years' imprisonment. In announcing its ruling, the court noted that the Illinois State Police's audit regarding Bode involved the accuracy of its testing of seminal fluid, which was not an issue in this

case. The court found that along with the DNA evidence at issue, the statement given by defendant at the police station was "overwhelming" in establishing him as the perpetrator of the assault.

¶ 19    On direct appeal, this court affirmed defendant's convictions over his claims that he was denied his right to confrontation because he did not have an opportunity to cross-examine the Bode analysts who prepared the DNA profile at issue, and that the State failed to lay a proper foundation for the Bode DNA profile. *People v. Stewart*, No. 1-08-2630 (2010) (unpublished summary order under Supreme Court Rule 23(c)(2)).

¶ 20    Defendant subsequently filed a post-conviction petition under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2012)), arguing that his sixth amendment right to confrontation was violated when the technician, who generated the male DNA profile from N.M.'s vaginal swab, did not testify at trial. The court dismissed the petition at the second-stage of post-conviction proceedings and this court affirmed the dismissal. *People v. Stewart*, No. 1-14-3565 (2016) (unpublished summary order under Supreme Court Rule 23(c)).

¶ 21    In 2016, defendant filed a motion pursuant to section 116-5 of the Code (725 ILCS 5/116-5 (West 2016)), requesting the circuit court enter a DNA database search by the Department of State Police and that the original sexual assault collection kit be made available for further forensic testing by a privately retained laboratory under section 116-3 of the Code (725 ILCS 5/116-3 (West 2016)).[1] On June 24, 2016, the court denied the motion in a two-page written order, stating *inter alia* that defendant had failed to satisfy the statutory requirements to obtain additional DNA testing because he "has not demonstrated that it can be subjected to additional testing utilizing a method

---

[1] This motion is not included in the record on appeal.

that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results."[2]

¶ 22    On February 17, 2017, defendant filed the *pro se* motion for additional DNA testing at bar. In the motion, filed pursuant to section 116-3 of the Code, defendant requested the evidence, which was previously tested by Bode and the Illinois State Police, be retested. He also requested that forensic testing be performed on N.M.'s clothing which had not been previously tested. Defendant argued that the previously tested material could be retested using a method that was not scientifically available at the time of trial, would be more accurate than the method used during his trial, and had the scientific potential to produce new, noncumulative evidence which was materially relevant to his assertion of actual innocence.

¶ 23    On October 2, 2017, the circuit court denied defendant's motion in a written order. In the order, the court noted that defendant sought "to erode confidence in the lab and insinuate that Bode might have made a mistake" which was not supported by the evidence. Further, in relevant part, the court found that the retesting sought would not produce a reasonable likelihood of more probative results, and the additional testing would not produce new, noncumulative evidence material to a claim of actual innocence. The court noted that the original testing used a PCR method, and the additional tests defendant sought were also forms of PCR testing, without adequately differentiating the two forms of testing. Finally, the court pointed out that the strength of the forensic evidence against defendant was "decisive" and therefore additional testing had no reasonable likelihood of producing exonerating evidence.

---

[2] Defendant filed two untimely notices of appeal regarding this order with the circuit court, in August 2016 and January 2017.

¶ 24 On appeal, defendant argues the circuit court erred in denying his motion for additional DNA testing, because he made a *prima facie* case for the testing, and the new testing would have the potential to produce new, noncumulative evidence that would significantly advance his claim of innocence.

¶ 25 "Section 116-3 of the Code delineates the prerequisites a defendant must meet in order to establish that he is entitled to, *inter alia*, postconviction forensic DNA testing." *People v. Smith*, 2014 IL App (1st) 113265, ¶ 19. Section 116-3(a) provides that a defendant may make a motion in the trial court for DNA testing "on evidence that was secured in relation to the trial * * * which resulted in his or her conviction" if the evidence was either (1) not subject at the time of trial to the requested testing, or (2) previously tested but "can be subjected to additional testing utilizing a method that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results." 725 ILCS 5/116-3(a) (West 2016). Defendants who seek to retest genetic material have a greater burden to establish their case than defendants whose evidence has not been tested at all. *People v. Stoecker*, 2014 IL 115756, ¶ 26.

¶ 26 In order to be entitled to DNA testing under the statute, a defendant must present a *prima facie* case "that identity was the central issue at trial and that the evidence to be tested was subject to a sufficiently secure chain of custody." *People v. Johnson*, 205 Ill. 2d 381, 393 (2002); 725 ILCS 5/116-3(b) (West 2016). Once a defendant establishes a *prima facie* case, the trial court must determine whether the testing will potentially produce new, noncumulative evidence which is materially relevant to the defendant's claim of actual innocence. *Johnson*, 205 Ill. 2d at 394; 725 ILCS 4/116-3(c) (West 2016). A trial court's ruling on a motion brought under section 116-3 is reviewed *de novo*. *Stoecker*, 2014 IL 115756, ¶ 21.

¶ 27    In this case, defendant requested DNA testing of N.M.'s clothing which was not tested prior to trial, and additional testing of the sexual assault kit which was previously tested. In this court, defendant solely argues that the circuit court erred in denying additional testing of the sexual assault kit.

¶ 28    The State does not dispute that identity was at issue in the case and that the evidence to be tested was subject to a sufficiently secure chain of custody. Rather, the State responds that defendant failed to show that retesting the sexual assault kit would produce new, noncumulative or more probative results. We agree with the State.

¶ 29    We initially note that, with respect to the sexual assault kit defendant seeks to have retested, he has failed to show that the testing methods mentioned in his motion were "not scientifically available at the time of trial that provides a reasonable likelihood of more probative results" as required by section 116-3(a)(2) of the Code. See 725 ILCS 5/116-3(a)(2) (West 2016). Rather, defendant questions the basis for the DNA profile generated by Bode, and notes that the forensic scientist who discovered the match of DNA testified as to the generalities regarding the science of DNA testing, including the fact that the scientists "look at" 13 spots on a person's DNA in making the match. He argues that newer testing examines more of these loci and is therefore more accurate than the original testing.

¶ 30    However, the additional DNA testing defendant requested was merely additional forms of PCR testing, which were scientifically available at the time of the trial. At trial, forensic scientist Brian Schoon testified that the analysis he initially performed on defendant's buccal swab was a PCR test. Other than defendant's own conclusory claim that these newer PCR tests were not scientifically available at the time of the trial, he does not provide any evidence of this claim.

Defendant's request for retesting of the sexual assault kit, therefore, fails to satisfy the statutory requirements set forth in section 116-3(a)(2). See 725 ILCS 5/116-3(a)(2) (West 2016).

¶ 31    Further, even if defendant's motion satisfied section 116-3(a)(2), we find the record establishes defendant's motion does not meet the section 116-3(c) requirement that retesting of the sexual assault kit has the potential to produce new, noncumulative evidence materially relevant to his claim of actual innocence.

¶ 32    Evidence that is " 'materially relevant' to a claim of actual innocence is simply evidence which tends to significantly advance that claim." *People v. Savory*, 197 Ill. 2d 203, 213 (2001). To determine whether evidence is materially relevant "requires a consideration of the evidence introduced at trial, as well as an assessment of the evidence defendant is seeking to test." *Id.* at 215.

¶ 33    At trial, N.M. testified that a man placed his arms around her neck "in a choke hold." This man dragged her to the ground, unzipped her pants and placed his fingers inside her vagina. He then pushed her into a gangway, held a knife against her throat, pulled her pants down, and proceeded to have vaginal intercourse with her. Defendant admitted to committing the assault and told Conway that "he had been frustrated at his life and home and he was drinking a lot" at the time. Defendant stated that he was driving that evening while impaired when he saw N.M. walking down the street. Defendant told Conway that N.M. "looked great" and was talking on her cellular phone when he saw her. Defendant stated he "just wanted immediate gratification" and got out of the car, followed her, and placed her "in a choke hold * * * to put her to sleep." Defendant then stated he dragged her into a gangway, put a serrated key to her throat, pulled down her pants, and sexually assaulted her. Schoon testified at trial that the male DNA profile from defendant's buccal

swab matched the profile from N.M.'s vaginal swab. In particular, Schoon explained "[t]he profile would be expected to occur approximately one in 3.3 quintillion blacks, one in 620 quadrillion white or one in 150 quadrillion Hispanic unrelated individuals." Given this strong evidence of defendant's guilt, including his own confession, any additional DNA testing of the sexual assault kit would likely not exonerate defendant, given such "decisive" DNA test results introduced into evidence at trial. See *Stoecker*, 2014 IL 115756, ¶ 34 (holding additional testing would likely not exonerate defendant where "the profile generated by her test results would be expected to occur in 1 in approximately 1.1 trillion Caucasians").

¶ 34    Defendant nevertheless claims that the newer DNA tests would examine more loci than the original PCR test which examined 13 loci and would therefore be more accurate. However, defendant has not advanced any evidence showing inaccuracy in the original testing. While defendant questions Schoon's testimony, and specifically the use of the 13 loci, he merely asserts that a test examining a greater number of loci would be more accurate, not that the original test was inaccurate. See *id.*, ¶ 35 (" 'Without having indicated some inaccuracy in the original testing, the results of the Y-STR testing should be the same as the results of the PCR testing; those results indicated that defendant could be included as a possible contributor to the semen stain found on the victim's pants.' ") (quoting *People v. Stoecker*, 2013 IL App (3d) 110300-U, ¶ 37 [Lytton, J. dissenting]). Therefore, defendant has failed to show that the results from the first tests were unreliable and that additional testing would significantly advance his claim of actual innocence given the great statistical likelihood that his DNA was present on the vaginal swab. Accordingly, defendant failed to show that retesting has the "potential to produce new, noncumulative evidence" that is materially relevant under section 116-3(c).

¶ 35    For the foregoing reasons, we affirm the trial court's order denying defendant's section 116-3 motion for testing and retesting of forensic evidence.

¶ 36    Affirmed.