2024 IL App (1st) 231296-U

No. 1-23-1296

Order filed June 10, 2024

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05 CR 12281 |
| | ) | |
| MARSHALL STEWART, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court's denial of defendant's *pro se* motion for leave to file a successive postconviction petition is affirmed where defendant failed to establish cause and prejudice for raising his claim that trial counsel rendered ineffective assistance when counsel did not cross-examine the State's expert witnesses about possible contamination of the DNA evidence.

¶ 2    Defendant Marshall Stewart appeals from an order of the circuit court of Cook County denying his *pro se* motion for leave to file a successive petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). On appeal, defendant contends the

court erred when it denied him leave to file his petition because he established cause and prejudice to allow him to raise a claim that his trial counsel rendered ineffective assistance. Defendant alleges trial counsel failed to cross-examine the State's expert witnesses with evidence of a laboratory error that resulted in contamination of the DNA evidence and cast doubt on the conclusion that defendant's DNA matched the male DNA profile recovered from the victim. We affirm.

¶ 3    Following a 2008 bench trial, defendant was convicted of four counts of aggravated criminal sexual assault and one count of aggravated kidnapping and sentenced to an aggregate term of 43 years' imprisonment. We discuss the facts from the prior proceedings as necessary for consideration of the issue in this appeal.

¶ 4    At trial, N.M. testified that on July 26, 2004, she was walking on the 2000 block of North Racine Avenue when a man came behind her and placed his arms around her neck "in a choke hold." The man dragged N.M. to the ground, unzipped her pants, and placed his fingers inside her vagina. He then pushed her into a gangway, held a serrated knife against her throat, pulled her pants down, and had vaginal intercourse with her. The man attempted anal intercourse but "gave up" and engaged in vaginal intercourse a second time. N.M. never saw the man. After the man fled, N.M. contacted the police, who drove her to the hospital. Hospital personnel treated N.M. for injuries to her neck and collected vaginal swabs from her.

¶ 5    Nurse Memuna Eccles-James testified that she treated N.M., who told her that "she was dragged into the alleyway, pinned down to the wall and somebody * * * pulled down her pants and attempted to rape her." N.M. had scratch marks on her neck. Eccles-James assisted the emergency room physician with collecting vaginal swabs from N.M. Eccles-James sealed the specimen kit containing the swabs and handed it to Chicago police officer Roy Kawasaki.

¶ 6    Chicago police evidence technician Roy Kawasaki testified that he photographed and recovered evidence from the scene and photographed N.M. at the hospital. Kawasaki collected the sealed sexual assault kit from Eccles-James at the hospital, inventoried it at his office, and prepared the kit for shipment to the Illinois State Police Crime Lab.

¶ 7    Chicago police detective Michael Conway testified that he interviewed defendant at the police station on May 12, 2005. Defendant waived his *Miranda* rights and admitted that he sexually assaulted N.M. Defendant told Conway that "he had been frustrated at his life and home and he was drinking a lot" at the time. Defendant stated that, on the evening of the assault, he was driving while impaired and saw N.M. walking on Racine, crossing the street in front of his car. Defendant told Conway that N.M. was talking on her cell phone and "looked great." Defendant stated that he "just wanted immediate gratification" and exited his vehicle and followed her. Defendant stated that he walked up behind N.M. and placed her "in a choke hold * * * to put her to sleep." Defendant further stated that he dragged N.M. into a gangway, held a long and very sharp serrated key against her throat, pulled down her pants, and sexually assaulted her. After the interview, an evidence technician collected a buccal swab from defendant. Defendant subsequently gave a handwritten statement to an assistant state's attorney.

¶ 8    Assistant State's Attorney Kelly Navarro testified that, after advising defendant of his *Miranda* rights, she took his written statement. Navarro published defendant's statement in court. The statement was consistent with Conway's recitation of his interview with defendant.

¶ 9    Manuel Sanchez, an evidence technician with the Sex Crimes Division of the Cook County State's Attorney's Office, testified that on September 14, 2004, he collected two buccal swabs from defendant. Sanchez sealed the swabs in a collection envelope and gave the envelope to Eileen

Moran, an investigator with the Cook County State's Attorney's Office. Moran testified that she received defendant's buccal swabs from Sanchez and transported them to Lori Lewis at the Chicago Police Department Crime Lab. Lewis, the supervisor of the evidence evaluation unit of the Chicago Police Department's forensic services section, testified that the sealed envelope containing defendant's swabs was stored in a secure location.

¶ 10 Michael Cariola, vice president of forensic operations and a technical leader at the Bode Technology Group (Bode), testified that Bode had a contract with the Illinois State Police to assist with their backlog for DNA testing. Bode received the sealed sexual assault evidence kit collected from N.M., including the vaginal swabs and a blood specimen from N.M. The Bode case number assigned to N.M.'s assault kit was IL04(1A)-210. Testing of the vaginal swabs indicated semen was present. Bode performed a "differential extraction" which created two samples from the one original sample – a sperm fraction and an epithelial fraction. The sperm fraction contained a mixture of two individuals' DNA profiles, specifically, N.M. and an unknown male contributor. Bode forwarded its test results to the Illinois State Police. Cariola testified that the proper protocols were followed at all times during the analysis process and that a proper chain of custody and documentation was maintained at all times.

¶ 11 On cross-examination, Cariola acknowledged that in 2005 the Illinois State Police audited Bode's serological work and found an error rate of approximately 22% in the "sperm search" cases that were audited. Consequently, the Illinois State Police cancelled its contract with Bode with respect to "the sperm search portion of the contract." No sperm search was performed in this case.

¶ 12 Brian Schoon, a forensic scientist at the Illinois State Police Forensic Science Center, testified that on April 20, 2005, he received the sealed buccal swab standard collected from

defendant and prepared it for forensic DNA analysis. As a part of the analysis, Schoon performed a Polymerase Chain Reaction (PCR) test, which resulted in defendant's DNA profile. On May 2, 2005, Schoon compared defendant's DNA profile with the male DNA profile Bode had identified on N.M.'s vaginal swabs. Schoon concluded that defendant's DNA profile matched the male DNA profile identified from the vaginal swabs. Schoon explained that "[t]he profile would be expected to occur approximately one in 3.3 quintillion blacks, one in 620 quadrillion white or one in 150 quadrillion Hispanic, unrelated individuals."

¶ 13    On cross-examination, defense counsel asked Schoon to explain what the DNA data looked like in Schoon's notes. Counsel stated, "I have a copy of everything you have, but I'd like you to point it out to me." Schoon referred counsel to page 46 of his notes for the raw data. Counsel remarked that it looked "like an EKG reading." Counsel also asked Schoon to explain the differences between his DNA chart and Bode's chart. Schoon referred to a page from Bode's case file. Schoon explained that Bode's chart did not look exactly the same as his because Bode had a mixture of two DNA profiles while Schoon's analysis was based on only one DNA profile. Schoon acknowledged that he did not know the condition of the DNA sample that Bode analyzed.

¶ 14    Defense counsel asked Schoon if there were "factors that could affect the numbers on the loci" such as "DNA degradation or contamination." Schoon replied, "[n]othing will change these numbers. It can just make it harder to detect the profile." The following colloquy then occurred:

"[Counsel:] Well, if there was some contamination of the sample, would that affect the numbers?

[Schoon:] You would have to find out. I mean, nothing is going to actually change the DNA profile of anybody. It would make -- it would make it harder to detect a profile or a clean profile, like contributing it to one person, but –

[Counsel:] Would it make the identification harder?

[Schoon:] Not necessarily.

[Counsel:] But, it wouldn't – it wouldn't change the genetic makeup?

[Schoon:] Not of a single-source profile. It would – you would see indications that there's a mixture if there was contamination, but nothing is gonna change my profile or your profile if it's gone through the testing – nothing will – your profile will always be the same thing.

Nothing can change that, not degradation or mixing other people's DNA in there. It will just make it harder to obtain a profile."

Schoon further testified, "the profile that I have matches the male DNA profile that Bode identified exactly. Just because their results are a mixture, doesn't change the fact that the ultimate male profile that they pulled out matches Marshall Stewart, that won't change."

¶ 15   Defense counsel also asked Schoon if any other factor, such as an air bubble in the liquid dye, could distort the data results. Schoon replied that, if that happened, it would be impossible to obtain any results that could be interpreted, and the test would have to be run again. Schoon explained that if something went wrong with the machine during testing, such as a power outage, or if the machine was dirty, the results would not be interpretable. Counsel specifically asked Schoon if there were "any contaminants" that would produce a result that was not uninterpretable but was inaccurate. Schoon testified that he could not think of anything that would be in a machine

or anything that could occur during testing that would produce a result that an analyst would not question and would change what was truly in the sample.

¶ 16    The trial court found defendant guilty of four counts of aggravated criminal sexual assault and one count of aggravated kidnapping and sentenced him to an aggregate term of 43 years' imprisonment. In announcing its ruling, the court noted that the Illinois State Police's audit regarding Bode involved the accuracy of its testing of seminal fluid, which was not an issue in this case. The court found that along with the DNA evidence, defendant's inculpatory statement was "overwhelming" evidence that proved he was the man who assaulted N.M.

¶ 17    On direct appeal, this court affirmed defendant's convictions over his claims that he was denied his right to confrontation because he did not have an opportunity to cross-examine the Bode analysts who prepared the DNA profile from the vaginal swabs, and that the State failed to lay a proper foundation for the Bode DNA profile. *People v. Stewart*, No. 1-08-2630 (2010) (unpublished summary order under Illinois Supreme Court Rule 23(c)(2)).

¶ 18    In 2013, defendant, through private counsel, filed his initial postconviction petition under the Act alleging that his sixth amendment right to confrontation was violated when the Bode technician who generated the unknown male DNA profile from N.M.'s vaginal swabs did not testify at trial. At an October 2014 hearing on the State's motion to dismiss defendant's petition, postconviction counsel stated that defendant had informed her that he found out there had been an error with the centrifuge, but counsel did not have the "exact information" or any "proof." The circuit court granted the State's motion and dismissed defendant's petition. On appeal, this court allowed appellate counsel to withdraw and affirmed the dismissal. *People v. Stewart*, No. 1-14-3565 (2016) (unpublished summary order under Illinois Supreme Court Rule 23(c)(2)).

¶ 19     In 2016, defendant filed a motion pursuant to section 116-5 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-5 (West 2016)), requesting that the circuit court order a DNA database search by the Department of State Police and that the original sexual assault collection kit be made available for further forensic testing by a privately retained laboratory under section 116-3 of the Code (725 ILCS 5/116-3 (West 2016)).[1] The circuit court denied the motion. Defendant filed two untimely notices of appeal in the circuit court.

¶ 20     In 2017, defendant filed a *pro se* motion for additional DNA testing pursuant to section 116-3 of the Code requesting that the evidence previously tested by Bode and the Illinois State Police be retested. He also requested that forensic testing be performed on N.M.'s clothing which had not been previously tested. Defendant argued that the previously tested material could be retested using a method that was not scientifically available at the time of trial, would be more accurate than the method used during trial, and had the scientific potential to produce new, noncumulative evidence which was materially relevant to his assertion of actual innocence.

¶ 21     In his motion, defendant noted that on February 12, 2005, Bode technicians reported a "centrifuge error" during which tubes containing 48 extracts had been incorrectly placed in the centrifuge, causing the extracts to spin out of the tubes. One of the 48 extracts was from N.M.'s sexual assault kit, Bode case number IL04(1A)-210. Defendant claimed this error contaminated the DNA samples. Defendant noted that on a Bode quality assurance incident form dated March 8, 2005, under a subheading entitled "Corrective Action," an analyst stated, "For each of the affected cases, original evidence substrate is available for re-testing." Defendant pointed out that the trial court had been notified of the error. Defendant asserted that errors in the initial forensic

---

[1] This motion is not included in the record on appeal.

testing had hindered justice in this case and he requested retesting conducted under "conditions that will ensure the integrity of the samples and the testing."

¶ 22     Defendant attached several exhibits to his motion including (1) a Bode Forensic Case Report for this case dated December 23, 2004, identifying a male DNA profile found on N.M.'s vaginal swabs; (2) a Bode Case Note dated March 7, 2005, reporting the centrifuge error and listing the 48 affected samples; (3) the Bode Quality Assurance Incident Form dated March 8, 2005, addressing the centrifuge error; (4) Schoon's July 21, 2005, response to a discovery request sent to the trial court indicating that copies of case files including all reports, memoranda, notes, phone logs, contamination records, and data related to the testing performed in this case was enclosed; and (5) an article from the New York Times from August 2005 reporting that the Illinois State Police had canceled its contract for DNA analysis with Bode.

¶ 23     The circuit court denied defendant's section 116-3 motion finding that defendant sought "to erode confidence in the lab and insinuate that Bode might have made a mistake" which was not supported by the evidence. The court explicitly found that the centrifuge error had no bearing on the analysis that matched defendant to N.M.'s sexual assault kit. The court noted that a male DNA profile was identified on N.M.'s vaginal swabs in December 2004 and uploaded into CODIS on January 28, 2005. Consequently, the court concluded that the centrifuge error that occurred on February 12, 2005, did not affect the DNA evidence in this case. The court also pointed out that the strength of the forensic evidence against defendant was "decisive" and, thus, additional testing had no reasonable likelihood of producing exonerating evidence. On appeal, this court affirmed that judgment. *People v. Stewart*, 2021 IL App (1st) 172998-U.

¶ 24    On December 1, 2021, defendant filed the instant *pro se* motion for leave to file a successive postconviction petition under the Act, incorporating the petition with his motion. Defendant alleged that he was raising a claim of actual innocence based on newly discovered evidence that the DNA sample had been contaminated when the centrifuge error occurred at Bode. Defendant asserted that "the contamination file was in Pre-Trial discovery, was in the court file itself, and was never presented at trial by the court, trial counsel, or the Prosecution." Defendant claimed that unbeknownst to him, the "botched DNA files" were withheld by all the parties at trial. Defendant argued that the trial court had a duty to enter the contamination file into the record at trial, and the court's "suppression" of the file was improper. Defendant further argued that the State violated discovery rules and *Brady v. Maryland*, 373 U.S. 83 (1963), when it "literally hid a DNA contamination file in plain sight" and suppressed the fact that a Bode forensic scientist "mixed and thereby contaminated 48 DNA samples."

¶ 25    In addition, defendant alleged that his trial counsel rendered ineffective assistance when counsel failed to review the discovery tendered to him or arbitrarily disregarded the contamination file. He claimed counsel could have impeached Schoon's authentication of the DNA test results by using the contamination file, which would have supported a defense of actual innocence and warranted a new trial.

¶ 26    Defendant asserted that he had cause for raising his claims in a successive postconviction petition because the factual and legal basis for his claims was not available to him during his prior proceedings where the contamination file had been suppressed by the State, the trial court, and trial counsel. He further argued that he suffered prejudice because, if the contaminated DNA file had been presented at trial, the "outcome would have most assuredly been different."

¶ 27    Defendant attached several documents to his successive postconviction petition including the same five documents enumerated above which he previously attached to his section 116-3 motion for forensic testing in February 2017. He also attached two reports the Illinois State Police Forensic Science Center sent to detectives in May 2005 indicating that defendant's DNA profile matched the male DNA profile Bode found on N.M.'s vaginal swabs. Defendant also attached an affidavit from Antonio D. Fletcher-Bey who averred that he is an incarcerated paralegal who assisted defendant with obtaining documents from the police under the Freedom of Information Act and drafted the successive postconviction petition on defendant's behalf.

¶ 28    The circuit court denied defendant's motion for leave to file his successive postconviction petition. The court found that the evidence of contamination was not newly discovered. It stated that defendant failed to demonstrate how the evidence would establish that he did not commit the sexual assault or how it would change the outcome at trial. The court pointed out that defendant failed to mention that he confessed to the assault and did not claim his confession was false. It further found that defendant's claim of ineffective assistance did not make sense. The court noted that "defense counsel challenged the DNA evidence at trial" and attempted to undermine the validity of the DNA evidence when he cross-examined Schoon about the cancellation of the Bode contract. The court concluded that defendant failed to raise a claim of actual innocence and failed to establish cause or prejudice to justify leave to file the successive petition.

¶ 29    On appeal, defendant contends the circuit court erred when it denied him leave to file his successive postconviction petition because he established cause and prejudice for his claim that his trial counsel rendered ineffective assistance. Defendant alleges counsel failed to cross-examine Cariola and Schoon with evidence of the centrifuge error which resulted in "potential

contamination" of the DNA evidence. Defendant claims he established cause for raising his claim in a successive petition because he did not have the evidentiary support to raise the claim in his initial postconviction petition. Defendant asserts he was prejudiced by counsel's failure to question Cariola and Schoon "about any specific instances of potential contamination that could have affected the DNA evidence" because doing so would have cast doubt on the conclusion that defendant's DNA matched the male DNA profile recovered from N.M.'s vaginal swabs.

¶ 30 The State responds that the circuit court correctly determined that defendant failed to satisfy the cause and prejudice test. The State asserts that defendant and his postconviction counsel knew about the centrifuge error when they filed his initial petition in 2013 and could have raised the claim then. The State further argues that defendant was not prejudiced by the centrifuge error because it occurred after Bode completed its testing related to this case and, therefore, had no effect on the test results. The State argues that, consequently, there was no incident of potential contamination for which trial counsel could have questioned Cariola and Schoon. In addition, the State asserts that the evidence against defendant was overwhelming where his detailed confession interlocked with N.M.'s account of the assault.

¶ 31 We review the circuit court's denial of leave to file a successive postconviction petition *de novo*. *People v. Dorsey*, 2021 IL 123010, ¶ 33. The Act provides a process whereby a prisoner can file a petition asserting that his conviction was the result of a substantial denial of his constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2020); *Dorsey*, 2021 IL 123010, ¶ 31. Both the legislature and our supreme court have made it clear that only one postconviction proceeding is contemplated under the Act. *People v. Edwards*, 2012 IL 111711, ¶ 22. It is well settled that successive

postconviction petitions are disfavored. *Id.* ¶ 29. "Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122-3 (West 2020).

¶ 32 Pursuant to section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2020)), defendant is prohibited from filing a successive postconviction petition without first obtaining leave of court. *People v. Lusby*, 2020 IL 124046, ¶ 27. Generally, such leave is granted only where defendant establishes cause for his failure to raise the claim in his initial postconviction proceeding, and prejudice results from that failure. 725 ILCS 5/122-1(f); *Dorsey*, 2021 IL 123010, ¶ 32. "Cause" is defined as "any objective factor, external to the defense, which impeded the petitioner's ability to raise a specific claim in the initial post-conviction proceeding." *People v. Pitsonbarger*, 205 Ill. 2d 444, 462 (2002). Prejudice occurs where the petitioner is "denied consideration of an error that so infected the entire trial that the resulting conviction or sentence violates due process." *Id.* at 464. Defendant must satisfy both prongs of the cause and prejudice test before he will be allowed to file a successive petition. *People v. Davis*, 2014 IL 115595, ¶ 14. The court should deny leave to file a successive petition when it is clear from the petition and supporting documents that the allegations raised fail as a matter of law or are insufficient to justify further proceedings. *Dorsey*, 2021 IL 123010, ¶ 33.

¶ 33 Here, we find defendant failed to satisfy the cause and prejudice test to be granted leave to file his successive postconviction petition. The history of this case illustrates defendant's repeated attempts over the past 10 years to discredit the DNA evidence, particularly the male DNA profile identified by Bode, under various theories. The instant petition is another attempt to do so, this time under the guise of an ineffective assistance of counsel claim.

¶ 34    The record shows that defendant was aware of Bode's DNA centrifuge error at the time of his initial postconviction proceedings. At the October 2014 hearing on the State's motion to dismiss defendant's initial petition, postconviction counsel stated that defendant had told her that he found out about the centrifuge error, but counsel had no "exact information" or "proof." The record does not indicate how or when defendant learned of the error, or when he received the Bode documentation. Yet somehow, defendant knew there had been a centrifuge error.

¶ 35    Although postconviction counsel had no supporting "proof," she argued that, if there had been an error with the centrifuge, the defense would have to be able to question the person who conducted the DNA testing in case there had been any errors with that testing. It therefore follows that, because defendant was aware of the centrifuge error and specifically concerned that the error may have affected Bode's DNA testing, defendant could have argued in his initial postconviction petition that trial counsel was ineffective for failing to question Cariola and Schoon about the error. Consequently, defendant has not established cause for failing to raise his ineffective assistance of counsel claim in his initial postconviction petition. *Pitsonbarger*, 205 Ill. 2d at 462.

¶ 36    Furthermore, defendant has not established that he suffered any prejudice. The record shows that defendant attached the same documentation regarding the centrifuge error to his section 116-3 motion for additional DNA testing filed in February 2017. In that motion, defendant claimed the centrifuge error had contaminated the DNA samples. The circuit court found that defendant's contamination claim was not supported by the evidence. The court explicitly stated that the centrifuge error had no bearing on the DNA analysis that matched defendant to N.M.'s sexual assault kit. The court noted that a male DNA profile was identified on N.M.'s vaginal swabs in December 2004 and uploaded into CODIS on January 28, 2005. Consequently, the court concluded

that the centrifuge error that occurred on February 12, 2005, did not affect the DNA evidence in this case. We concur with the circuit court's sound analysis of the evidence.

¶ 37    Moreover, the record shows that during cross-examination, trial counsel extensively questioned Schoon about possible contamination of DNA evidence and how contamination would affect DNA testing results. The report of proceedings from trial shows that counsel asked Schoon if there were any factors that could affect DNA test results, such as DNA degradation "or contamination." Schoon replied, "[n]othing will change these numbers. It can just make it harder to detect the profile." Counsel then specifically asked Schoon, "if there was some contamination of the sample, would that affect the numbers?" Schoon explained, "nothing is going to actually change the DNA profile of anybody." Schoon confirmed that contamination would not change the genetic makeup of a DNA profile from a single source. Schoon explained that, if there was contamination, the test results would indicate a mixture of multiple people's DNA, but it would not change the DNA profiles.

¶ 38    The record further shows that counsel asked Schoon about other possible errors that could occur during testing and how such errors would affect the DNA test results. Counsel asked what would happen if there were an air bubble in the dye or a problem with the machine during testing. Schoon explained that such errors "would make it impossible to get a result, so you would have to run the test again." Schoon testified that there was nothing that could occur during testing that would render a usable DNA result that was not accurate. Schoon repeatedly and adamantly testified that the male DNA profile Bode identified from N.M.'s vaginal swabs "exactly" matched defendant.

¶ 39    The record thereby demonstrates that, although trial counsel did not specifically question Schoon or Cariola about the centrifuge error, counsel thoroughly questioned Schoon about how various forms of contamination would affect DNA test results. Counsel made a vigorous and persistent attempt to undermine the credibility of the DNA evidence that identified defendant as the man who assaulted N.M. but could not tarnish the reliability of that evidence.

¶ 40    Based on this record, we conclude that defendant failed to establish cause and prejudice for raising his ineffective assistance of counsel claim in a successive postconviction petition. 725 ILCS 5/122-1(f); *Dorsey*, 2021 IL 123010, ¶ 32. Accordingly, the circuit court's denial of defendant's *pro se* motion for leave to file a successive postconviction petition was proper. *Davis*, 2014 IL 115595, ¶ 14.

¶ 41    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 42    Affirmed.