2024 IL App (1st) 230330

SIXTH DIVISION
August 23, 2024

No. 1-23-0330

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 01 CR 02288(03) |
| XAVIER COX, | ) ) | The Honorable James Michael Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.

Justices Hyman and Tailor concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant Xavier Cox, age 28,[1] was convicted in 2005, after a bench trial,[2] of murder and aggravated kidnapping on an accountability theory. Defendant was sentenced to 21 years for felony murder, and an additional 20 years for personally discharging a firearm during the commission of the offense, for a total of 41 years. Defendant also received a concurrent 10-year sentence for the aggravated kidnapping. After sentencing, defendant filed and withdrew

---

[1]This was defendant's age at the time of the offense.
[2]Although the trial court's July 22, 2022, order, from which this appeal is taken, says that defendant was convicted "[f]ollowing a jury trial," defendant had, in fact, a bench trial.

a direct appeal. This court later affirmed a second-stage dismissal of defendant's first postconviction petition, where the petition failed to make a substantial showing that his trial counsel was ineffective for not filing a motion to suppress defendant's allegedly coerced statement and for not communicating a plea offer. *People v. Cox*, 2012 IL App (1st) 102690-U, ¶¶ 1, 20, 26.

¶ 2        Defendant subsequently filed a *pro se* motion for leave to file a second postconviction petition, which the trial court denied. However, this court vacated the trial court's order and remanded for further proceedings, since the trial court had not ruled on a then-pending *pro se* motion to add a second affidavit from another event witness. *People v. Cox*, 2021 IL App (1st) 192252-U, ¶¶ 1, 16. On remand, the trial court again denied defendant leave to file his second petition.

¶ 3        In the present appeal, defendant challenges the trial court's second denial of leave to file his second petition. Defendant's one claim on appeal is that his second petition sets forth a colorable claim of actual innocence based on the affidavits of two event witnesses, namely, Dereck Brown and Leonard Kidd. For the following reasons, we affirm.

¶ 4                                I. BACKGROUND

¶ 5        The 38-year-old victim, Pierre Mahone, was shot on September 29, 2000, as the result of a gang dispute. After defendant's later arrest on December 22, 2000, defendant made a statement implicating himself in the crime. Defendant was then indicted, along with his codefendants Fontaine Lewis and Linnard Kidd, for murder and kidnapping.

¶ 6        Defendant and codefendants Kidd and Lewis had three simultaneous, although severed, bench trials before the same judge. In the simultaneous bench trials, the State delivered a

collective opening statement regarding all three defendants. Another codefendant, Terrell Fenner, was acquitted in an earlier trial in front of the same trial judge.[3]

¶ 7    Of the two affiants involved in this appeal, one was codefendant Leonard Kidd, who testified as part of his own simultaneous bench trial, and the other is Derek Brown, who was a witness in the simultaneous part of the trial, regarding both defendant and codefendant—now affiant—Kidd.

¶ 8    At the trial which began in August 2005, the State called several eyewitnesses who had witnessed the kidnapping. The State's first witness, after the victim's mother, was Larone Tate who testified that he (Tate) and the victim were both members of the Conservative Vice Lords and that the victim was the "chief of the Vice Lords." On the day of the kidnapping, at approximately 2:20 p.m., Tate just happened to be outside, pitching pennies with Napoleon Smith, Derek Brown and others, when he noticed the victim drive up in his vehicle and seven or eight other vehicles pull up on either side of the street behind him. One vehicle pulled up in front of the victim's vehicle, boxing him in. When the victim exited his vehicle, 15 or 20 men, armed with baseball bats and guns, exited their vehicles and approached the victim's vehicle. Tate identified defendant as one of the approaching men. Defendant raised his gun in the air and told others to do the same. After one man slapped the victim in the head with a pistol, defendant yelled at the others "don't whip him." Napolean Smith, who was also outside, ran into a nearby house, and one of the men told Tate "to go in the house and get that n*** that ran into the house." After entering the house, Tate watched from a front window, as the group hit the victim with bats and guns, but Tate did not see defendant at that point. As the victim

_____

[3]This trial judge is not the same judge who considered defendant's second postconviction petition either the first time or on remand.

was trying to escape, Tate heard a gunshot and heard someone in the house say, "they just shot him." The group then grabbed the victim and threw him into the back seat of a Chevy Suburban that drove away. After the Suburban drove away, Tate saw defendant. Defendant "pulled to the side and got out" of his vehicle and shot his gun two or three times in the air and directed other vehicles off the block.

¶ 9        On cross, Tate testified that, when defendant first arrived on the scene and exited his vehicle, defendant said "tell them the X-Man did it." Tate testified that he "wouldn't have knew [*sic*] Xavier if he wouldn't have said his name." Referring to defendant, Tate explained: "He is the X-Man." Although Tate had known defendant two or three years at that point, Tate would not have known it was defendant because of the chaos of "[p]eople jumping out with guns." However, Tate testified: "[w]hen he came up close I knew who he was." Tate did not see defendant hit the victim, and defendant was in a different car than the one that drove off with the victim.

¶ 10        The next witness was one of the two affiants involved in this appeal: Derek Brown. Brown testified that he had prior felony convictions for cannabis possession and that he currently had another case pending in the same courthouse for possession of a controlled substance. However, no deals or promises had been made in relation to that pending case in order to get him to testify. Brown testified that, on the day of the offense, at approximately 2:20 p.m., he was outside with a group of guys including Smith, who Brown knew as "Buck," and Tate. Like Tate, Brown testified that, after the victim pulled up in his vehicle, "[a] lot of cars" pulled up, blocking him in. When the victim exited his car, 15 or 20 men exited their cars with baseball bats and guns. When defendant exited his car, defendant pointed his gun and "told everybody to get" the victim. At different times, defendant was pointing his gun at

4

different people. Brown testified that Kidd, who Brown knew as "Bam," hit the victim across the head with a gun. Other people also hit the victim. Brown backed up some porch steps, with his daughter, and then tried to run into the house, but the door was closed. Defendant told Brown not to move and told one of the other men "to get" Brown. The man pointed a gun at Brown, and Brown came back down the porch steps as directed. However, Brown then ran with his daughter in the opposite direction. When Brown stopped running, he called the police. Although Brown heard gunshots that day, he did not see who was shooting.

¶ 11   Brown testified that, on December 15, 2000, at 3:30 p.m. in the afternoon, he viewed a lineup and picked out codefendant Fontaine Lewis as the man who had pointed a gun at Brown and who had waved Brown down the stairs. On cross, Brown testified that, on October 9, approximately 10 days after the event, he went to the police station and talked with Detective Fitzsimmons and an assistant state's attorney (ASA) who wrote out a statement that Brown signed. However, on the day of the offense, he did not speak with police. Brown testified that, prior to the kidnapping, he had known the victim for 15 or 20 years. At the time of the kidnapping, Smith was on the porch with Brown, and Smith ran up the steps just ahead of Brown, and it was Smith who shut the door on Brown.

¶ 12   On cross, Brown testified that he had previously testified in the trial of Fenner in September 2002. After being asked whether he testified that it was Fenner who had hit the victim in the head with a gun, Brown admitted that he could not remember. On redirect, Brown said yes when asked whether, in his October 9, 2000, statement to police, he (Brown) had stated that defendant had told the victim that the victim was coming with him. Brown acknowledged that he recognized his signature on the bottom of every page. However, when asked whether he remembered what defendant said when defendant pointed his gun, Brown

said he did not remember. Brown recalled testifying before the grand jury on December 27, 2000, and Brown agreed that he had testified at that time that defendant had told the victim that the victim was coming with him.

¶ 13        Rudolfo Escalante testified that he currently lived in Mexico, that the state's attorney's office had paid for his round-trip plane ticket to Chicago, his hotel, and $100 in spending money. At 2:30 p.m. on September 29, 2020, he was living in Chicago and waiting for a bus, when he observed a black man hanging out of the open door of a Suburban, screaming "help me, help me," while a passenger tried to grab him. After Escalante returned to the area later that day, a person told him that there was a dead man in the alley. Escalante went to the alley and recognized the dead man as the man who Escalante had seen earlier, hanging out of the Suburban.

¶ 14        Brandi Harrison testified that she observed the attack on the victim from her living room window. Harrison testified that the victim pulled up in his car, that other cars pulled up, blocking him in, and that "a lot of guys" exited the cars. At that point, Harrison had known the victim for eight years or more. When the other men exited their cars, the victim was still inside his car. Two men walked up to the victim's driver's side door, and one told him to get out. When the victim exited his car, one of the men hit the victim across the head with a gun. Harrison identified defendant as one of the two men who had walked up to the victim's door, and she testified that he hit the victim across the head with his gun. After defendant hit the victim, "they" walked away, and some of the men started fighting the victim and the victim was fighting back. One of the men shot the victim in the leg, and he fell down. After the victim was shot, the other men lifted him into the Suburban and the Suburban drove off. Harrison did

not see defendant at this point. Harrison identified codefendant Lewis as one of the men who was out on the street that day, but she did not recall him "doing anything."

¶ 15        On cross, Harrison testified that defendant approached the victim's car, tapped the closed window with his gun, and told the victim to get out of his car. At the time of the offense, Harrison had known defendant "[m]aybe three years, maybe," and not that well. Harrison recalled stating to the police on October 10, 2000, that defendant stated that he did not want the victim dead.

¶ 16        Smith testified that he had four felony drug convictions, that he was a member of the Conservative Vice Lords, and that the victim had been the head of their gang. At 2:20 p.m., on September 29, 2000, Smith happened to be on the porch pitching pennies with several people, including Tate and Brown, when the victim pulled up and eight or nine cars pulled up around him, blocking him in. Defendant and codefendant Kidd, whom Smith knew as Bam, exited a car. Smith had known defendant and Kidd five or six years, and he knew they were members of the New Breed gang. When the victim exited his car, codefendant Kidd hit the victim in the head with a pistol, and defendant was hollering that "X-Man did it." Smith testified that X-Man was a nickname for defendant. Although defendant was pointing his gun "[a]t everybody," he was not pointing it at the victim. About 15 or 20 men exited the cars, with guns and baseball bats, and they were whipping the victim. Codefendant Lewis came onto the porch where Smith was, pointed a gun at Smith, and told him not to move. However, Smith went into the house and called the police. Looking out a window, Smith could see men hitting the victim with a baseball bat and gun, trying to force the victim into a Suburban. Smith heard a gunshot and saw codefendant Lewis with a gun pointing at the victim's feet. After the victim was in the Suburban, it drove off, and Smith stayed in the house until the police arrived. On cross,

Smith explained that, after Lewis told him not to move, Lewis looked away and that was when Smith ran into the house. On cross, Smith agreed that he had previously testified at Fenner's trial that it was Fenner who had told him not to move.

¶ 17        The parties then entered several stipulations including one regarding the forensic pathologist who found 39 different points of injury and a close-range gunshot wound to the head. In addition, a gunshot appeared to enter the right calf, exit, and enter the left calf. After several continuances, defendant's trial continued on November 9, 2005, when ASA Irene McNamara testified regarding defendant's pretrial statement.

¶ 18        ASA McNamara testified that, after speaking with defendant for several hours on December 23, 2000, she handwrote out a statement that defendant read and signed. On a prior appeal, this court found that trial counsel was not ineffective for not filing a motion to suppress this statement, because "it is unlikely that a motion to suppress defendant's statement would have been granted." *Cox*, 2012 IL App (1st) 102690-U, ¶ 33.

¶ 19        In the statement, defendant stated that he was a 28-year-old high school graduate, with an electrician's degree from Concordia College, and that he lived with his fiancée and his daughter. Defendant had been a member of the New Breed gang for two years, from 1996 to 1998, and still had their motto tattooed on his chest. Codefendant Kidd, who defendant knew as Bam and as a member of the New Breed gang, started selling phencyclidine (PCP) in August 2000 on a particular street corner that "belong[ed]" to the Vice Lords, a rival gang. Specifically, the corner was "run[ ]" by the victim, who was a five-star prince of the Vice Lords, with over 25,000 people under his control. This corner is "an extremely hot spot to buy dope and there's much money to be made."

¶ 20    Defendant stated that on September 29, 2000, the day of the offense, at 10:30 a.m., the victim confronted codefendant Kidd and told Kidd that he could no longer sell PCP on that corner. Kidd was upset and called codefendant Lewis, who controlled the south and west sides of Chicago for the New Breed gang, with 5000 people under his control. At noon on September 29, defendant was standing outside, when codefendant Lewis pulled up in a white Riviera and told defendant to come to a New Breeds meeting, which defendant understood not to be an optional request. About a dozen other cars were already following Lewis's car, and defendant also followed in his blue Crown Victoria. They drove to a house, where Lewis retrieved guns from inside the house and gave them to about eight men, including defendant. Then they drove to a vacant lot, where Lewis and Kidd told everyone about the dispute between the victim and Kidd and that the plan was to kidnap the victim and hold him for $50,000 ransom.

¶ 21    Defendant stated that Lewis and Kidd explained that the victim was being set up by a Vice Lords member who would let them know where the victim was. For this information, the cooperating Vice Lord would receive half the ransom money. Lewis would receive $15,000, Kidd would receive $5000, and the rest would be split up among everyone else. Defendant thought he would receive $800 from the kidnapping. After Lewis was informed where the victim would be, Lewis told defendant that the cooperating Vice Lord would be in defendant's car and that they should be the first car to approach the victim since the victim knew them and, thus, would not be scared away. In addition, Lewis told defendant "to act as a lookout and security," which defendant understood to mean that he (defendant) would protect Lewis from the Vice Lords.

¶ 22    Defendant stated that, at 1:45 p.m., he and about 16 other cars drove near the location, that the victim arrived at 2 p.m., and that defendant's car was the first car to pull up near the

victim's car. Defendant and the cooperating Vice Lord walked up to the victim's car and said, "what's up," and the victim replied, "what's up." Codefendants Lewis and Kidd approached the victim and began talking about "the dope spot." Defendant pulled out his gun, to act as security, and he heard the victim say he would not give up his dope spot. Kidd then hit the victim in the head with a bat, and Lewis hit him in the head with the butt of his gun. Defendant told them not to kill the victim. Kidd and Lewis then forced the victim into a Suburban, which Kidd, Lewis, and others also entered before it drove off. After it drove off, defendant fired his gun in the air to make people, who were standing outside, go back in their houses. Defendant was then shot in the hand, but he does not know who shot him. Later defendant went to the hospital to treat his hand.

¶ 23        Defendant stated that, later that night, Lewis informed him that Lewis had shot the victim in the head because the victim would not sit still in the Suburban. Defendant told Lewis that he was going to call the police. After introducing defendant's statement, the State rested, and defendant asked for a continuance, which was allowed. On December 22, 2005, defendant moved for a directed finding, which was denied, and defendant rested. The State presented a closing argument with respect to defendant alone, arguing that either the testimony of the event witnesses or defendant's statement was sufficient to convict, but together they were proof beyond a reasonable doubt that defendant was guilty of aggravated kidnapping and, thus, guilty of murder on an accountability theory. The State argued:

> "When the defendant combined with those people to conduct an unlawful act, that being the aggravated kidnapping of [the victim], and that being a forcible felony, the defendant was making himself accountable not just for that act, but for the subsequent death of the victim, the murder of the victim by his co-conspirators.

In this case it's immaterial that this defendant, that there is no proof that this defendant actually committed the actual murder."

Thus, the State conceded, in effect, that there was no proof that defendant committed the actual murder, thereby removing that issue from the case. The State argued: "If defendant did participate in the aggravated kidnapping, then he is guilty of the murder." In response, the defense pointed out the discrepancies in the witnesses' testimony about who did what, as well as the incentive that Vice Lord witnesses, such as Tate and Smith, had to implicate members of a rival gang. The defense also argued that there was no evidence to connect defendant to the murder. Defense counsel argued that "at best the State has made a case for his participating in the aggravated kidnapping; at best." After listening to the evidence and argument, the trial court stated simply, without explanation, that it found that the State had proved all the charges beyond a reasonable doubt.

¶ 24    On January 30, 2006, the trial court denied defendant's posttrial motion for a new trial and proceeded to sentencing. On his own behalf, defendant stated:

"At the time the thing was going on I was forced to. I didn't know what was going on. So I—I got shot in the process. I'm sorry about what happened. Just I didn't know what was going to happen. That's my real statement."

The court then merged all the murder counts into count VI for felony murder, observed the range was 20 to 60 years, and sentenced defendant to 21 years for the murder. The court then added, to the 21-year sentence, a consecutive 20-year sentence for the personal discharge of a firearm during the felony murder, for a total of 41 years. For the aggravated kidnapping, the court sentenced him to a 10-year concurrent term. On March 7, 2006, the trial court denied defendant's motion to reconsider sentencing. On August 17, 2006, this court allowed

defendant's motion for leave to file a late notice of appeal, and the trial court subsequently appointed the state appellate defender to represent him. However, on September 19, 2006, this court entered an order stating that it granted defendant's motion to dismiss his direct appeal.

¶ 25    The record before us also contains a motion filed, almost two years later, on March 16, 2008, to dismiss his direct appeal. This 2008 motion is accompanied by a "Declaration" signed by defendant stating that his attorney explained to him the consequences of dismissing his appeal and that he realizes that he is foregoing "any direct appellate attack on my conviction or sentence." The record contains a letter, dated November 30, 2007, from an assistant state appellate defender (ASAD) to defendant explaining that he runs "a *significant* risk of getting anywhere from an extra *26 years in prison* up to as much as an extra *50 years in prison*."[4] (Emphases in original.) The ASAD's letter suggests that defendant "might be better off proceeding with a post-conviction petition" with another attorney who had recently contacted her about representing defendant. This court then entered a second order, on April 7, 2008, granting the motion and again dismissing the appeal, but with a different appellate case number (No. 1-06-2237) than our prior order dismissing his appeal (No. 1-06-0899).

¶ 26    On January 23, 2009, less than three years from his sentencing, and less than 10 months after the second dismissal of his direct appeal, the previously noted attorney filed defendant's first postconviction petition. The petition alleged, among other things, that defendant's trial counsel failed to communicate a plea offer of 18 years by the State and failed to litigate a filed motion to suppress defendant's statement. The petition was advanced to the second stage on February 24, 2009, and counsel was appointed. The State filed a motion to dismiss on October

---

[4]In a subsequent filing, on March 12, 2010, defendant's counsel explained that "he was in a classic Catch -22 position." The defense argued that, "had his appeal proceeded, [defendant] was advised that his sentence could have been raised if his appeal was denied, because his original sentence was below the required minimum."

5, 2009, which the trial court granted on August 29, 2010. This dismissal was affirmed by this court on October 26, 2012. *Cox*, 2012 IL App (1st) 102690-U.

¶ 27    Affirming the second-stage dismissal of his first postconviction petition, this court found that it was "unlikely that a motion to suppress defendant's statement would have been granted." *Cox*, 2012 IL App (1st) 102690-U, ¶ 33. Specifically, this court found that the "record rebuts defendant's claims that he was not given his *Miranda* warnings [(see *Miranda v. Arizona*, 384 U.S. 436 (1966))], that his request for an attorney was denied and that his statement was the product of coercion and physical abuse." *Cox*, 2012 IL App (1st) 102690-U, ¶ 33. Since the motion would not have been granted, this court found that trial counsel was not ineffective for deciding not to file it. *Cox*, 2012 IL App (1st) 102690-U, ¶ 33.

¶ 28    Approximately six years after the denial of his first petition, defendant filed the present *pro se* "petition for successive post conviction relief based on newly discovered evidence" on July 6, 2018. Defendant's petition alleged that his prior statement was the result of physical and mental coercion and that the attached affidavit from Brown was newly discovered evidence supporting defendant's claim of innocence.

¶ 29    In the attached affidavit, dated May 7, 2018, Brown averred:

"I, Derek Brown, declare that the information I'm coming forward with [i]s true and accurate in substance and in fact.

2, I was tak[en] to the 11th District Police Station for questioning.

3. I was question[ed] by the detectives. They kept pressuring me to tell a different story than what I I [*sic*] saw related to Xavier Cox. I kept telling I didn't want to do that.

13

4. I was also being pressured by my own gang. They told me that I had to implicate Xavier Cox as the person who was giving the orders. When my gang made the request[,] I knew I had to do it at that time.

5. What actually happen[ed] that September day of 2000 was Xavier Cox was not giving orders[,] in fact I heard him say 'what are ya'll doing['] when they started attacking Pierre, he also wrapped his arms around him as if he was trying to shield him.

6. It's been pretty tough on me over [the] last 18[ ] years knowing that my false testimony contributed to an innocent man being sent away for basically the rest of his life.

7. After discussing this with my family and friends I decided to come forward with [the] truth.

8. So I was able to connect with the investigator working on Xavier's case and I told him my truth.

9. Finally, I am willing to testify in the court of law to what I laid out in my affidavit."

¶ 30     On November 13, 2018, defendant filed a motion to supplement his petition with codefendant Kidd's affidavit which was attached. In the affidavit, dated October 9, 2018, Kidd averred:

"I, Linard Kidd, hereby declare under penalty of perjury that the following is true and correct based upon my personal knowledge and that I am competent to testify thereto if called upon as a witness.

I am coming forward because on September 29, 2000[,] Xavier Cox didn't have any knowledge of what was going on when 'Pierre' Elbert Malone was kidnapped and

later shot to death. In fact my Co-defendant tried to stop the abduction that later resulted in the death of 'Pierre' Elbert Malone. Mr. Xavier Cox is innocent of any crimes connected with the events of September 29, 2000. Mr. Cox sh[ie]lded 'Pierre' and was shot in doing so. Mr. Cox never had any weapon(s)[5] either. I stated in my trial to that very fact. Mr. Xavier Cox had nothing to do with the abduction or death of 'Pierre' Elbert Malone."

¶ 31        On April 26, 2019, the trial court denied defendant's motion for leave to file, without considering defendant's motion to supplement his petition with Kidd's affidavit. On appeal, we vacated the trial court's order and "remand[ed] for a ruling on defendant's motion to supplement." *Cox*, 2021 IL App (1st) 192252-U, ¶ 16. We stated: "In so holding, we express no opinion regarding the meris of defendant's motions and proposed successive postconviction petition." *Cox*, 2021 IL App (1st) 192252-U, ¶ 16.

¶ 32        On remand, the trial court[6] granted defendant's motion to supplement and then denied defendant's now supplemented motion for leave to file his second petition.[7] In an order entered July 22, 2022, the trial court did not find either Brown's or Kidd's affidavit to be newly discovered evidence of actual innocence.

---

[5]The parentheses are in the original.

[6]The trial judge, the Honorable James M. Obbish, is a different judge than the judge, the Honorable Henry R. Simmons Jr., who presided over the bench trials of defendant and his codefendants Kidd, Lewis, and Fenner.

[7]In addition to his actual innocence claim, defendant's second petition (1) reasserted his prior ineffectiveness claim, which had been previously addressed by this court in his prior appeal, and (2) asserted a *Brady* claim. See *Brady v. Maryland*, 373 U.S. 83 (1963). The trial court found neither claim persuasive, and neither claim is raised on this appeal. Thus, we do not include here the trial court's discussion of them.

¶ 33    First, the trial court discussed Brown's affidavit, noting that Brown's affidavit indicated that defendant was present for the kidnapping and that Brown's affidavit did not specifically recant his prior statements which had implicated defendant in the kidnapping.

¶ 34    The trial court noted that the sentencing court merged all the other murder counts into the felony murder count. With respect to felony murder, the trial court reasoned:

"Here, even if this Court were to accept Brown's [affidavit] that he lied about Cox 'giving orders' and that Cox actually tried to protect the victim, these facts are immaterial of Cox's innocence under the felony murder statute. *** Notably, Brown's affidavit does not recant his statements that Cox participated in the kidnapping, was armed, and pointed his gun 'everywhere.' Nor does Brown's affidavit rebut the rest of the relevant evidence at trial, including Cox's own inculpatory statement wherein he admitted to agreeing to help kidnap the victim, participated in its planning, and brandished a gun to act as 'security' during the kidnapping. Cox's involvement in the initial aggravated kidnapping was enough for the felony murder rule to attach, even though his codefendant drove off with the victim and killed him, supposedly outside of Cox's presence and without his prior knowledge."

As a result of these facts, the trial court found that "Brown's affidavit is irrelevant to the basis of [defendant's] conviction," since it relates only to whether defendant did, or did not, intend to murder the victim, "while not addressing the relevant issue" of whether defendant intended "to carry out the kidnapping that was the basis for his conviction."

¶ 35    Further, the court noted that Brown witnessed only the abduction itself and, therefore, he could not speak to what defendant and his fellow codefendants planned or discussed prior to the abduction or what defendant did after the abduction, up to the moment when the victim

was killed. For all these reasons, the trial court found that "Brown's affidavit did not undermine the court's confidence in the finding of Cox's guilt based upon his legal responsibility for the murder," under the felony murder statute.

¶ 36    Second, turning to Kidd's affidavit, the trial court stated that "Kidd's trial predated Cox's trial" and Kidd swore in his affidavit that he had testified at his own trial that defendant was unarmed. As a result, the trial court found that "Kidd was a readily discoverable and available source" at defendant's trial. (The record before us establishes that, rather than one trial predating the other, defendant and codefendants Kidd and Lewis had three simultaneous, although severed, bench trials before the same judge. Another codefendant, Fenner, was acquitted in an earlier trial in front of the same judge, Judge Henry R. Simmons.)

¶ 37    The trial court noted that, even assuming that portions of Kidd's affidavit were not included in Kidd's trial testimony, Kidd's affidavit did not aver that he would have come forward but for his own criminal exposure. Therefore, the trial court found Kidd to be a readily available and known source.

¶ 38    In addition, the trial court found that Kidd's affidavit was not so conclusive as to change the result at trial. The trial court stated: "Kidd's affidavit is a benign gesture inculpating no one, exculpating Cox, and providing no facts upon which a meaningful prosecution could be premised against the murderers of the victim—including Kidd." Kidd's affidavit gave no basis as to how he (Kidd) would know that defendant had "nothing to do with the abduction" as Kidd claimed, since Kidd did not aver that he (Kidd) had anything to do with the abduction himself. Finding the affidavits neither newly discovered nor material or conclusive, the trial court found that defendant's second petition failed to set forth a colorable claim of actual innocence.

17

¶ 39        On December 12, 2022, defendant filed a notice of appeal, stating that he had previously mailed it in August, but it was not filed. On December 27, 2022, this court entered an order stating that defendant's notice of appeal was inadvertently docketed and that the appeal was stricken from the record. However, on March 13, 2022, this court granted defendant's motion for leave to file a late notice of appeal.

¶ 40        II. ANALYSIS

¶ 41        On this appeal, defendant challenges the dismissal of his supplemented motion to file a second postconviction petition alleging his actual innocence. For the following reasons, we affirm.

¶ 42        A. Postconviction Petition

¶ 43        Defendant seeks relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). The Act contemplates the filing of "[o]nly one petition *** without leave of the court." 725 ILCS 5/122-1(f) (West 2020); *People v. Sanders*, 2016 IL 118123, ¶ 24. Any claim not in the original petition, or an amended version of it, is normally waived. 725 ILCS 5/122-3 (West 2020); *Sanders*, 2016 IL 118123, ¶ 24. However, this bar against successive petitions is overcome if defendant can (1) satisfy the *Pitsonbarger* cause and prejudice test (see *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002); 725 ILCS 5/122-1(f) (West 2020)) or (2) show evidence of actual innocence. *Sanders*, 2016 IL 118123, ¶ 24. In the case at bar, defendant claims actual innocence.

¶ 44        The evidence supporting an actual-innocence claim must be (1) new, (2) material and noncumulative, and (3) of such a conclusive character that it would probably change the result on retrial. *People v. Allen*, 2015 IL 113135, ¶ 22; *People v. Coleman*, 2013 IL 113307, ¶ 96. "New means the evidence was discovered after trial and could not have been discovered earlier

18

through the exercise of due diligence." *Coleman*, 2013 IL 113307, ¶ 96. "Material means the evidence is relevant and probative of the petitioner's innocence." *Coleman*, 2013 IL 113307, ¶ 96. To be material, the evidence "need not, standing alone, exonerate the defendant; rather, it must tend to 'significantly advance' his claim of actual innocence." *People v. Stoecker*, 2014 IL 115756, ¶ 33. "Noncumulative means the evidence adds to what the jury heard." *Coleman*, 2013 IL 113307, ¶ 96. Conclusive means that the additional evidence, "when considered along with the trial evidence, would probably lead to a different result." *Coleman*, 2013 IL 113307, ¶ 96. "Probability, not certainty, is the key ***." *Coleman*, 2013 IL 113307, ¶ 97; *People v. Robinson*, 2020 IL 123849, ¶ 48. A piece of new evidence is conclusive if it "would probably change the result on retrial, either by itself or in conjunction with" other new evidence also presented by the petitioner. *Sanders*, 2016 IL 118123, ¶ 53; see *Coleman*, 2013 IL 113307, ¶¶ 104-08 (considering together the statements of all the new witnesses presented by defendant).[8]

¶ 45       "[L]eave of court to file a successive postconviction petition should be denied only where it is clear from a review of the petition and attached documentation that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Sanders*, 2016 IL 118123, ¶ 24. It is presumed that the new evidence will contradict the evidence of defendant's guilt at trial; otherwise "the purpose of the Act would be rendered meaningless." *Robinson*, 2020 IL 123849, ¶ 57. "For new evidence to be positively rebutted" at the leave-to-file stage, "it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where" the trial record "affirmatively and incontestably demonstrate[s]" the

---

[8]Our supreme court has "specifically rejected the total vindication or exoneration standard" set forth in *People v. Savory*, 309 Ill. App. 3d 408, 415 (1999). *Robinson*, 2020 IL 123849, ¶ 55 (citing *People v. Savory*, 197 Ill. 2d 203, 213 (2001) (specifically rejecting the "complete vindication" standard set forth in the lower court's opinion)).

new evidence "to be false or impossible." *Robinson*, 2020 IL 123849, ¶ 60. As an example of what would rise to the level of false or impossible, the supreme court cited a case where the new evidence asserted that the victim had been shot only once, but the autopsy evidence at trial established that he had been shot multiple times. *Robinson*, 2020 IL 123849, ¶ 59 (citing *Sanders*, 2016 IL 118123, ¶ 48). Once leave to file a successive petition is granted, it is docketed for second-stage proceedings. See *Sanders*, 2016 IL 118123, ¶ 28.

¶ 46    When no evidentiary hearing is held, as in the case at bar, a reviewing court's standard of review is *de novo*. *Sanders*, 2016 IL 118123, ¶ 31. *De novo* consideration means that we perform the same analysis that a trial judge would perform. *People v. Carrasquillo*, 2020 IL App (1st) 180534, ¶ 107.

¶ 47                B. Of a Conclusive Character

¶ 48    "[C]onclusiveness of the new evidence is the most important element of an actual innocence claim." *Sanders*, 2016 IL 118123, ¶ 47; *Robinson*, 2020 IL 123849, ¶ 47. "We need not address whether petitioner's new evidence could have been discovered earlier in the exercise of due diligence" or "whether it is material and not merely cumulative" if "we conclude that, even assuming these conditions have been satisfied, the evidence is not of such conclusive character that it would probably change the result on retrial." *Sanders*, 2016 IL 118123, ¶ 47. "Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 48. In the case at bar, the trial court found that the affidavits submitted by defendant were not so conclusive, in large part, because they did not undercut his participation in the underlying felony.

¶ 49    All of defendant's murder convictions were merged into one count of felony murder. An individual commits felony murder, if while attempting or committing a forcible felony other than second degree murder, he or she or another participant causes a death. 720 ILCS 5/9-1(a)(3) (West 2020). The purpose of the felony-murder statute is to deter individuals from committing forcible felonies by subjecting an offender to a first degree murder charge if another person is killed during that felony. *People v. Pugh*, 261 Ill. App. 3d 75, 77 (1994). In proving felony murder, the State does not have to prove an intent to kill, which distinguishes it from other forms of first degree murder where the State must prove either an intentional or knowing killing. *People v. Davison*, 236 Ill. 2d 232, 239-40 (2010).

¶ 50    In considering whether the new evidence would be conclusive, we must consider the evidence that was presented against the defendant at trial. *Robinson*, 2020 IL 123849, ¶ 47 ("the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result"). The primary evidence against defendant was his own statement and the testimony of event witnesses. Defendant previously alleged that his statement was coerced and that his trial counsel was ineffective for failing to move to suppress it, and that issue was resolved against him. In terms of persuasive value, obviously, defendant was telling the police what he hoped would free him and what he hoped they wanted to hear; no sane person ever said: "I want to spend the rest of my life in prison."

¶ 51    As for the witnesses, it is odd that members of the victim's gang,[9] were all hanging outside, innocently "pitching pennies," at the moment when the offense occurred, and no one lifted a finger to help their chief. It is interesting that Smith, with four felony drug convictions,

---

[9]Tate and Smith testified at trial that they were members of the victim's gang, and Brown averred in his affidavit that he was in a gang and pressured by the gang to implicate defendant, thereby indicating that Brown was also in a rival gang to defendant and in the same gang as Tate, Smith, and the victim.

and Brown, with felony drug convictions and one pending case, decided to call the police, but we cannot help but notice that it is unusual that calling the police was the first form of assistance that gang members and drug dealers reached for.[10] And of course, they all named members of the opposing gang. It was uncontroverted that defendant did not put the victim in the car, that he did not drive away in the same car as the victim, and that defendant was shot at the scene. By all accounts, defendant was there at the start and afterward but curiously absent in the middle.

¶ 52    However, on the other hand, defendant stated at his sentencing that he did not have a choice, which is consistent with his pretrial statement that his participation was not option, and which is, by itself, a tacit admission of participation. All the witnesses placed him on the scene and participating, and Brown's affidavit does not dispute that. Kidd asserts that defendant had "nothing to do" with the victim's "abduction or death" but offers no details about how he knows that. An assertion is only as good as the witness's basis for knowledge.

¶ 53    Kidd's testimony at his own simultaneous trial is part of the record on this appeal. Kidd's testimony was that Kidd went to the area where the offense occurred, because he was told that the victim wanted to talk to him. The victim thought that Kidd was "selling on his block." On the stand, Kidd denied selling drugs at the time. Kidd drove over, parked his car, and walked over through a vacant lot. As Kidd walked up, he heard defendant say " 'No, man, it's not like that,' " and he saw Lewis holding a gun on the victim. Kidd had no intent of participating in a kidnapping, and he was scared and just reacted to the events as they unfolded.

---

[10]Kidd testified in his portion of the simultaneous trial that there was a hail of gunfire from the victim's gang.

¶ 54    Regarding defendant, Kidd testified that, on the day of the offense but before it occurred, defendant had told Kidd "he was fittin' to go holler at" the victim. Kidd testified: "This is our neighborhood. We don't have no problems with the Vice Lords. It's not about gang-banging." According to Kidd, the victim had "a street tax" on people who sold drugs in his territory. Kidd testified that, when he walked over to the area where the offense occurred, there were "a lot of cars," and he saw the victim pull up. When the victim pulled up, defendant blew his horn and pulled up on the side of the victim's car. Lewis jumped out of a car with a gun, and defendant also jumped out of a car with a gun. Kidd walked up to where Lewis and defendant were, and the victim grabbed Kidd. Kidd started punching the victim, and then a lot of people jumped on the victim. The victim was being pretty badly beaten and was hit with a bat. Kidd helped the victim into the Suburban, and the Suburban took off. Prior to his entering the Suburban, Kidd said there was a rain of gunfire, and he stated: "My whole thing to get in this van was to get out of gunfire." According to Kidd, there was "a rain of gunfire, because [the victim's] guys came out at this time. They came out shooting." At some point, while the Suburban was driving, the victim tried to get out of the van, and Kidd grabbed the victim's arm and pulled him back in, but Kidd did not know at that time what was going to happen to the victim. The Suburban pulled into an alley, and Lewis approached the Suburban and pulled the victim out. Lewis took the victim 12 or 13 steps away; Kidd heard a shot and saw the victim drop. Then Kidd entered another car that drove off.

¶ 55    First, Kidd's prior testimony does not indicate how he would know that defendant had nothing to do with the abduction, as Kidd asserted in his affidavit. In other words, Kidd's testimony does not fill in the vacuum left by his affidavit. Second, Kidd stated in his affidavit that defendant "never had any weapon(s) either. I stated in my trial to that very fact." However,

at his trial, Kidd testified that defendant had a gun. Kidd was asked this question and gave this answer:

"Q. And [defendant] jumped out of a car. He had a gun too?

A. Yes, he had."

Thus, contrary to the assertion in Kidd's affidavit that Kidd testified at his own trial that defendant did not have a weapon, Kidd did testify that defendant had a gun.

¶ 56 The key part of Brown's affidavit is where he asserts: "Xavier Cox was not giving orders[,] in fact I heard him say 'what are ya'll doing['] when they started attacking Pierre, he also wrapped his arms around him as if he was trying to shield him." However, this line also establishes that defendant was on the scene and not simply a bystander. Brown says defendant was not giving orders and, at one point, tried to protect the victim, but the affidavit does not controvert the other parts of Brown's prior testimony and does not eliminate the option that defendant was acting as security, as defendant himself stated in his pretrial statement. Even if we assume that the event details averred in Brown's affidavit are true—that defendant was not the one giving orders and that he tried to physically protect the victim at one point—defendant could still have been a participant in the kidnapping scheme.

¶ 57 At a retrial, it is not simply Brown's trial testimony that poses grist for cross examination. Brown provided a number of prior statements: (1) his October 9, 2000, statement to police; (2) his December 27, 2000, grand jury testimony; (3) his testimony at the September 2002 trial of Terrell Fenner; and (4) his August 2005 testimony at the simultaneous trial of defendant and his codefendants.

¶ 58 For all the foregoing reasons, we find that "the evidence is not of such conclusive character that it would probably change the result on retrial." *Sanders*, 2016 IL 118123, ¶ 47.

Kidd's affidavit asserts no basis for knowledge, and the few facts asserted in Brown's affidavit still leave intact, for the most part, his multiple prior incriminating statements.

¶ 59     If defendant's present theory is that he lacked the intent to participate in the kidnapping because he was coerced, he has not argued that, and his two supporting affidavits say nothing about coercion of defendant. In addition, defendant argued at sentencing that he "was forced to" participate and that he "didn't know what was going on," thereby indicating that this was an argument that could have been made at trial.

¶ 60                                      III. CONCLUSION

¶ 61     For the reasons explained above, we find that the motion for leave to file defendant's second postconviction petition, asserting an actual innocence claim based on the Brown and Kidd affidavits, was properly denied.

¶ 62     Affirmed.

---

***People v. Cox*, 2024 IL App (1st) 230330**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 01-CR-02288(03); the Hon. James Michael Obbish, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Richard Connor Morley, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, David H. Iskowich, and Retha Stotts, Assistant State's Attorneys, of counsel), for the People. |

---